No. 23-1698

# In the
# United States Court of Appeals
## for the Seventh Circuit

———————————

AXIS INSURANCE COMPANY,
*Plaintiff-Appellant*

*v.*

AMERICAN SPECIALTY INSURANCE & RISK SERVICES, INC.,
*Defendant-Appellee*

———————————

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division
No. 1:19-cv-00165-DRL-SLC
The Honorable Damon R. Leichty, Judge

———————————

**BRIEF FOR PLAINTIFF-APPELLANT**

———————————

Brian J. Paul
Ryan M. Hurley
Stephanie L. Gutwein
Emily A. Kile-Maxwell
300 North Meridian Street, Ste. 2500
Indianapolis, IN 46204
Telephone:  317-237-0300
Fax:  317-237-1000
brian.paul@faegredrinker.com
ryan.hurley@faegredrinker.com
stephanie.gutwein@faegredrinker.com
emily.kilemaxwell@faegredrinker.com

*Attorneys for Plaintiff-Appellant AXIS
Insurance Company*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __23-1698__

Short Caption: AXIS Insurance Company vs. American Specialty Insurance & Risk Services, Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    AXIS Insurance Company

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Faegre Baker Daniels LLP, and Faegre Drinker Biddle & Reath LLP

(3)      If the party, amicus or intervenor is a corporation:

    i)      Identify all its parent corporations, if any; and

        See attached page

    ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: _/s/Brian J. Paul_     Date: __07/14/2023__

Attorney's Printed Name: Brian J. Paul

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✓]  **No** [ ]

Address: 300 N. Meridian St., Suite 2500

    Indianapolis, IN  46204

Phone Number: 317-237-0300     Fax Number: 317-237-1000

E-Mail Address: brian.paul@faegredrinker.com

i)      Identify all its parent corporations, if any;

AXIS Specialty U.S. Holdings, Inc., a wholly owned subsidiary of AXIS Specialty Global Holdings Limited, a wholly owned subsidiary of AXIS Capital Holdings Limited.

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: ___23-1698___

Short Caption: __AXIS Insurance Company vs. American Specialty Insurance & Risk Services, Inc.__

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐　　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

　　__AXIS Insurance Company__

　　_____

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

　　__Faegre Baker Daniels LLP, and Faegre Drinker Biddle & Reath LLP__

　　_____

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and

　　　　__See attached page__

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

　　　　_____

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

　　_____

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

　　_____

Attorney's Signature: __/s/Ryan M. Hurley__　　　　Date: __07/14/2023__

Attorney's Printed Name: __Ryan M. Hurley__

Please indicate if you are _Counsel of Record_ for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** ☐　**No** ☒

Address: __300 N. Meridian St., Suite 2500__

　　__Indianapolis, IN  46204__

Phone Number: __317-237-0300__　　　　Fax Number: __317-237-1000__

E-Mail Address: __ryan.hurley@faegredrinker.com__

rev. 12/19 AK

i)        Identify all its parent corporations, if any;

AXIS Specialty U.S. Holdings, Inc., a wholly owned subsidiary of AXIS Specialty Global Holdings Limited, a wholly owned subsidiary of AXIS Capital Holdings Limited.

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No:  23-1698

Short Caption:  AXIS Insurance Company vs. American Specialty Insurance & Risk Services, Inc.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 AXIS Insurance Company

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Faegre Baker Daniels LLP, and Faegre Drinker Biddle & Reath LLP

(3)     If the party, amicus or intervenor is a corporation:

   i)     Identify all its parent corporations, if any; and

   See attached page

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:



(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:



(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:



Attorney's Signature:  /s/Stephanie L. Gutwein          Date:  07/14/2023

Attorney's Printed Name:  Stephanie L. Gutwein

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☐   **No** ☒

Address:  300 N. Meridian St., Suite 2500

   Indianapolis, IN  46204

Phone Number:  317-237-0300          Fax Number:  317-237-1000

E-Mail Address: stephanie.gutwein@faegredrinker.com

rev. 12/19 AK

i)      Identify all its parent corporations, if any;

AXIS Specialty U.S. Holdings, Inc., a wholly owned subsidiary of AXIS Specialty Global
Holdings Limited, a wholly owned subsidiary of AXIS Capital Holdings Limited.

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: ___23-1698___

Short Caption: __AXIS Insurance Company vs. American Specialty Insurance & Risk Services, Inc.__

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    __AXIS Insurance Company__

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    __Faegre Baker Daniels LLP, and Faegre Drinker Biddle & Reath LLP__

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        __See attached page__

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: __/s/Emily Kile-Maxwell__    Date: __07/14/2023__

Attorney's Printed Name: __Emily Kile-Maxwell__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☒

Address: __300 N. Meridian St., Suite 2500__

    __Indianapolis, IN  46204__

Phone Number: __317-237-0300__    Fax Number: __317-237-1000__

E-Mail Address: __emily.kilemaxwell@faegredrinker.com__

rev. 12/19 AK

i)       Identify all its parent corporations, if any;

AXIS Specialty U.S. Holdings, Inc., a wholly owned subsidiary of AXIS Specialty Global Holdings Limited, a wholly owned subsidiary of AXIS Capital Holdings Limited.

## Table of Contents

**Page**

STATEMENT OF JURISDICTION ............................................................. 1

INTRODUCTION ........................................................................................ 2

STATEMENT OF THE ISSUE ................................................................... 7

STATEMENT OF THE CASE ..................................................................... 8

    I.      The Parties and Their Business Relationship ....................... 8

    II.     The Parties' Contract ............................................................. 8

    III.   American Specialty's Issuance of the 2013 Policies ............ 11

    IV.   The Tynes Claim ................................................................... 14

    V.     The Team's Initial Assertion of Excess EL Coverage........... 16

    VI.   The Tynes Litigation and the Buccaneers' Additional Demand for Coverage ............................................................ 19

    VII.  AXIS's Additional Notice to American Specialty Regarding the Tynes Claim .................................................. 21

    VIII. The Mediation and Resolution of the Tynes Claim ............. 24

    IX.   AXIS Seeks Redress from American Specialty for the Coverage Dispute. ............................................................... 27

SUMMARY OF THE ARGUMENT ......................................................... 30

STANDARD OF REVIEW......................................................................... 33

ARGUMENT ............................................................................................. 34

    I.      AXIS Complied with the Indemnity Agreement. ................. 34

         A.     AXIS Argued Below and Is Entitled to Argue Here that the PMA Did Not Require it to Tender a Defense. ...................................................................... 36

B.     The District Court Erred in Reading into the Indemnity Agreement Requirements that the Agreement Does Not Contain ....................................... 38

II.     The Settlement Was Not "Voluntary." ................................. 42

III.    American Specialty Had Notice and an Opportunity to Participate in Settlement Discussions, and Regardless AXIS's Settlement Contribution Was Fair and Reasonable .............................................................. 47

A.     American Specialty Had Notice and an Opportunity to Participate in the Mediation .............. 48

B.     AXIS's Contribution to the Tynes Settlement Was Fair and Reasonable. .................................... 53

IV.    The District Court's "Tender-Or-Actual-Liability" Rule Conflicts With Indiana Law. ................................. 54

A.     The District Court's Application of a "Tender-or-Actual-Liability" Standard Negates Indiana Law's Estoppel Analysis ........................................... 55

B.     Indiana Law Provides Ample Opportunity for Indemnitors to Protect Their Interests Without Imposing a "Tender-or-Actual-Liability" Requirement ................................................. 58

CONCLUSION ....................................................... 63

CERTIFICATE OF COMPLIANCE ......................................... 65

CERTIFICATE OF SERVICE ............................................ 66

SHORT APPENDIX ................................................... 67

# TABLE OF AUTHORITIES

**Cases**                                              **Page(s)**

*Acme Oil v. Vasatka,*
   465 So. 2d 1314 (Fla. Dist. Ct. App. 1985) ......................................... 46

*Aetna Cas. & Sur. Co. v. Katz,*
   377 N.E.2d 678 (Ind. Ct. App. 1978) ................................................. 44

*Atlantic Richfield Co. v. Interstate Oil Transp. Co.,*
   784 F.2d 106 (2d Cir. 1986) .................................................................. 61

*Bethlehem Steel Corp. v. Sercon Corp.,*
   654 N.E.2d 1163 (Ind. Ct. App. 1995) .............................. 38, 43, 47, 48

*In re Calvert,*
   913 F.3d 697 (7th Cir. 2019) ................................................................ 37

*Chevron Oronite v. Jacobs Field Servs. N. Am., Inc.,*
   951 F.3d 219 (5th Cir. 2020) ................................................................ 61

*Consol. Rail Corp. v. Allied Corp.,*
   882 F.2d 254 (7th Cir. 1989) ................................................................ 43

*Dreaded, Inc. v. St. Paul Guardian Ins. Co.,*
   904 N.E.2d 1267 (Ind. 2009) ................................................................ 41

*Essex Grp., Inc. v. Nill,*
   594 N.E.2d 503 (Ind. Ct. App. 1992) .................................................. 41

*Firestone Fin. Corp. v. Meyer,*
   796 F.3d 822 (7th Cir. 2015) ................................................................ 37

*Fontenot v. Mesa Petroleum Co.,*
   791 F.2d 1207 (5th Cir. 1986) ................................................ 39, 40, 60

*Franklin United Methodist Home, Inc. v. Lancaster Pollard
   & Co.,*
   909 F. Supp. 2d 1037 (S.D. Ind. 2012) ................................................ 53

*GE Cap. Info. Tech. Sols., Inc. v. Campbell Ads LLC*,
    No. 2:11-CV-082-PPS-APR, 2013 WL 587887 (N.D. Ind.
    Feb. 11, 2013) ..................................................................... 41

*Grace Vill. Health Care Facils., Inc. v. Lancaster Pollard &
    Co.*,
    No. 3:11-cv-29, 2013 WL 4012662 (N.D. Ind. Aug. 6, 2013) ............. 53

*Henson v. CSC Credit Servs.*,
    29 F.3d 280 (7th Cir. 1994) .................................................. 19

*Henthorne v. Legacy Healthcare, Inc.*,
    764 N.E.2d 751 (Ind. Ct. App. 2002) ........................................ *passim*

*Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark &
    Linard, PC*,
    929 N.E.2d 838 (Ind. Ct. App. 2010) ........................................ 38, 62

*Integrity Bio-Fuels, LLC v. Musket Corp.*,
    No. 1:13-cv-00768, 2015 WL 1417849 (S.D. Ind. Mar. 27,
    2015) .............................................................................. 44

*Jennings v. United States*,
    374 F.2d 983 (4th Cir. 1967) ................................................. 60, 61

*Kaydon Acquisition Corp. v. Custum Mfg., Inc.*,
    317 F. Supp. 2d 896 (N.D. Iowa 2004) .................................... 60

*Keystone Consol. Indus., Inc. v. Emps. Ins. Co. of Wausau*,
    456 F.3d 758 (7th Cir. 2006) ................................................ 40

*Luna Vanegas v. Signet Builders, Inc.*,
    46 F.4th 636 (7th Cir. 2022) ................................................ 37

*Masters v. Masters*,
    99 N.E.3d 711 (Ind. Ct. App. 2018) ........................................ 41

*McClish v. Niagara Mach. & Tool Works*,
    266 F. Supp. 987 (S.D. Ind. 1967) .......................................... 62

*Mead Johnson & Co. v. Kenco Grp., Inc.*,
  899 N.E.2d 1 (Ind. Ct. App. 2009) ....................................... 39

*Ohio Cas. Grp. of Ins. Cos. v. Royal-Globe Ins. Cos.*,
  413 N.E.2d 678 (Ind. Ct. App. 1980) ................................... 44

*Old Colony Ins. Co. v. Trapani*,
  118 So. 2d 850 (Fla. Dist. Ct. App. 1960) ........................... 45

*One Beacon Insurance, LLC v. M & M Pizza, Inc.*,
  8 A.3d 18 (N.H. 2010) ........................................................ 60

*Pan Am. Petroleum Corp. v. Maddux Well Serv.*,
  586 P.2d 1220 (Wyo. 1978) ................................................. 61

*Plumlee v. Monroe Guar. Ins. Co.*,
  655 N.E.2d 350 (Ind. Ct. App. 1995) ................................... 35

*Premier Corp. v. Econ. Rsch. Analysts, Inc.*,
  578 F.2d 551 (4th Cir. 1978) ......................................... 40, 60

*Price v. Amoco Oil Co.*,
  524 F. Supp. 364 (S.D. Ind. 1981) ............................... *passim*

*Progressive Constr. & Eng'g Co. v. Ind. & Mich. Elec. Co.*,
  533 N.E.2d 1279 (Ind. Ct. App. 1989) .............. 42, 43, 47, 57

*Sequa Coatings Corporation v. Northern Indiana Commuter
  Transportation District*,
  796 N.E.2d 1216 (Ind. Ct. App. 2003) ........................ *passim*

*Sink & Edwards, Inc. v. Huber, Hunt & Nichols, Inc.*,
  458 N.E.2d 291 (Ind. Ct. App. 1984) .......................... *passim*

*Smith v. Hartman Walsh Painting Co.*,
  No. 1:15-CV-94, 2017 WL 3051524 (D.N.D. June 30,
  2017), *report & recommendation adopted*, No. 1:15-CV-94,
  2017 WL 3037438 (D.N.D. July 18, 2017) ...................... 39, 60

*TLB Plastics Corp. v. Procter & Gamble Paper Prod. Co.*,
  542 N.E.2d 1373 (Ind. Ct. App. 1989) ................................. 38

*Trinity Homes LLC v. Ohio Cas. Ins. Co.,*
  629 F.3d 653 (7th Cir. 2010) ................................................ 33

*Tsareff v. ManWeb Servs., Inc.,*
  794 F.3d 841 (7th Cir. 2015) ................................................ 33

*U.S. Fid. & Guar. Co. v. Ozdemir,*
  No. 1:08-CV-1501-RLY-DML, 2010 WL 1325571 (S.D. Ind.
  Mar. 30, 2010) ...................................................................... 39

*United States v. City of Chicago,*
  869 F.2d 1033 (7th Cir. 1989) .............................................. 38

*Valloric v. Dravo Corp.,*
  357 S.E.2d 207 (W. Va. 1987) .............................................. 61

*Vernon Fire & Casualty Ins. Co. v. Graham,*
  336 N.E.2d 829 (Ind. Ct. App. 1975) ............................. 43, 44

*Estate of Williams v. S. Ind. Gas & Elec. Co.,*
  551 F. Supp. 2d 751 (S.D. Ind. 2008) .................................. 47

## Statutes, Rules, & Regulations

28 U.S.C. § 1291 .......................................................................... 1

28 U.S.C. § 1332(a)(1) ................................................................. 1

Fed. R. Evid. 201 ....................................................................... 19

## Other Authorities

Centers for Disease Control & Prevention,
  https://www.cdc.gov/mrsa/index.html ................................ 15

Florida State Court case docketing,
  https://hover.hillsclerk.com/html/case/caseSearch.html ............. 19, 20

## STATEMENT OF JURISDICTION

The District Court's subject-matter jurisdiction over this dispute arose under 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest, fees, and costs. Specifically, plaintiff AXIS Insurance Company is an Illinois corporation with its principal place of business in Georgia. Defendant American Specialty Insurance & Risk Services, Inc., is an Indiana corporation with its principal place of business in Indiana. And AXIS is seeking over $4 million in damages from American Specialty. *See, e.g.*, Dkt. 139, ¶¶ 7-11.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because AXIS is appealing from a final judgment that the District Court entered in American Specialty's favor on March 20, 2023. *See* SA 16. AXIS timely appealed from that entry of final judgment on April 12, 2023. Dkt. 303.

## INTRODUCTION

In 2015, AXIS Insurance Company found itself facing two separate, but related, disputes. The first dispute involved a claim for insurance made by the Tampa Bay Buccaneers, which is a member club of the National Football League. The Buccaneers claimed they were entitled to excess employers liability coverage under an insurance policy that American Specialty Insurance & Risk Services, Inc. had issued to the team on AXIS paper in 2013—coverage the Buccaneers had specifically requested. The Buccaneers' claim for excess "EL" coverage arose out of allegations of negligence made by the team's former placekicker, Lawrence Tynes, who claimed he had contracted a career-ending infection in a Buccaneers' locker room.

In response to the Buccaneers' claim for coverage, AXIS immediately notified American Specialty that it was reserving its right to seek contractual indemnification for any losses it might incur as a result of the apparent errors and omissions American Specialty had made in quoting, underwriting, binding, and issuing the excess EL policy and responding to the Buccaneers' coverage claim. This led to the second dispute. Over the next 18 months, AXIS twice reasserted its right to seek

2

indemnification in letters American Specialty indisputably received. American Specialty, however, never responded to either of those communications. American Specialty also ignored the Buccaneers' demand that American Specialty participate in a court-ordered mediation of the Tynes claim, and AXIS's own request that American Specialty join it in those settlement discussions at the mediation. Instead, the week before the Tynes mediation, and then again on the day of the mediation itself, American Specialty denied all liability in written exchanges with the Buccaneers' former insurance broker.

So, AXIS participated in the mediation without American Specialty, contributed toward the settlement, and then sued American Specialty for indemnification. Only **then** did American Specialty challenge AXIS's decision to participate in the settlement and AXIS's attendant right to indemnification for that settlement. According to American Specialty, as well as the District Court, AXIS should have expressly asked American Specialty to assume the defense of the coverage claim—a claim that was not yet in litigation—which AXIS did not do. Barring that, the District Court concluded, AXIS had to prove it bore actual liability to the Buccaneers. And since AXIS had not done the former, and because it was

impossible to do the latter, the District Court concluded AXIS was out of luck.

But that is not what Indiana law requires, and the District Court erred as a matter of law in concluding otherwise. While some courts outside of Indiana do impose some form of a "tender-or-actual-liability" requirement, in an effort to ensure that an indemnitor is not unfairly saddled with an unnecessary settlement, Indiana courts do not.

Indiana's framework for evaluating demands for contractual indemnification of settled claims accounts for this very same concern, just in a different way. First, Indiana law requires a showing that the indemnitee satisfied the terms of the parties' indemnification agreement. Second, Indiana law requires a showing that the settlement was not "voluntary," which really just means it was not a gift; an objective showing of potential liability is all that is needed to show lack of voluntariness. And third, Indiana law requires a showing that the indemnitor received notice and an opportunity to participate in the settlement, or, alternatively, that the terms of the settlement were fair and reasonable.

All of these requirements are satisfied here. There is no dispute AXIS satisfied the conditions on its indemnification in the parties'

written agreement. As to voluntariness, American Specialty stated in two separate letters that it had made a mistake in failing to provide excess EL coverage and asked AXIS to reform the applicable policy. Under governing Florida law, if a mutual mistake is made when issuing insurance, the policy may be reformed. Even the District Court acknowledged AXIS faced potential liability under these circumstances. And as to whether American Specialty had notice and opportunity to participate in the settlement, it unquestionably did. In the face of two separate requests to participate in the mediation, American Specialty denied all liability.

What was AXIS to do in this situation? Risk the chance the Buccaneers would convince a Florida factfinder that the policy could be reformed based on American Specialty's previous admissions it made a mistake? Surely not. American Specialty was, after all, AXIS's managing general agent, and therefore if American Specialty could be held responsible for providing excess EL coverage—and the Buccaneers certainly would have argued it could—so too could AXIS. At all events, the settlement was fair and reasonable. No one disputes the Tynes claim was legitimate. Nor can it be disputed that AXIS settled that claim on favorable

terms; it paid but a fraction of what Tynes was demanding in compensation for an infection that ended his NFL career.

Whatever other states may require of an indemnitee in this situation, Indiana law has its own requirements, and they do not necessitate tendering a defense or showing actual liability. The District Court erred as a matter of law in reading into the law what no Indiana decision or any term of the parties' agreement requires. The judgment should be reversed.

## STATEMENT OF THE ISSUE

Whether Indiana law requires a party seeking contractual indemnification for a settlement payment to demonstrate, in absence of any express contractual condition, that it tendered a defense to the indemnitor or was actually liable on the underlying claim, as the District Court concluded; or whether the party seeking indemnification must, instead, demonstrate (1) it satisfied the terms of the parties' indemnification agreement, (2) it had potential liability, and (3) the indemnitor had notice and opportunity to participate in the settlement or, alternatively, that the settlement was fair and reasonable, as *Sequa Coatings Corporation v. Northern Indiana Commuter Transportation District*, 796 N.E.2d 1216 (Ind. Ct. App. 2003), and other cases actually say.

## STATEMENT OF THE CASE

### I.  The Parties and Their Business Relationship

AXIS is an insurance company that offers specialty insurance poli-
cies, including policies for professional sports teams. *See, e.g.*, Sep. Appx.
10 (recitals). American Specialty served as AXIS's managing general
agent under a Program Manager Agreement, or "PMA," which was exe-
cuted in 2008 and amended over time. Dkt. 139, ¶¶ 20, 58; *see also, e.g.*,
Sep. Appx. 10; Sep. Appx. 34; Dkt. 229-35 at 3-4, 40:14-41:11 (authenti-
cating Sep. Appx. 1-54); Sep. Appx. 55-64; Dkt. 229-27 at 3-5, 24:8-26:4
(authenticating Sep. Appx. 55-64).[1] In that role, American Specialty
quoted, underwrote, bound, and issued insurance policies for AXIS to pro-
fessional sports organizations and serviced claims under those AXIS pol-
icies. Dkt. 139, ¶¶ 18, 21-22; Dkt. 44, ¶¶ 23-25.

### II.  The Parties' Contract

The PMA consists of three documents, all of which are cross-refer-
enced and incorporated into the PMA:

1.   the Program Manager Agreement,

2.   the Underwriting Guidelines Addendum, and

---

[1]   To the extent evidence was necessary to authenticate an exhibit that AXIS relied
on below, AXIS provides a citation to that evidence with its first citation of the
related exhibit.

3.     the Claims Service and Management Agreement.

Together these three documents established the bounds of American Specialty's authority to quote, underwrite, bind, and issue insurance policies, and to handle claims under those policies, all on AXIS's behalf. *See* Sep. Appx. 10; Sep. Appx. 65; Sep. Appx. 35-54; Sep. Appx. 55-63; Dkt. 229-35, 39:11-44:2 (authenticating Sep. Appx. 65-99); *see also* Dkt. 139, ¶¶ 24-29, 42-45, 51; Dkt. 263-5, 26:19-27:3.

Among other things, the PMA required American Specialty to comply with all of AXIS's instructions, *see* Sep. Appx. 14, PMA § 6.1; maintain complete and accurate records, including underwriting and policy files, *see id.*, PMA § 6.2; Sep. Appx. 49; issue complete and accurate policies, *see* Sep. Appx. 18, PMA § 16.2; act only within the scope of its authority from AXIS, *see id.*, PMA §§ 4.1, 5.4, 6.1, 6.2, 9.4; Sep. Appx. 45-50, § 3; and immediately notify AXIS in writing of any action it took in excess of its contractual authority and "do such things and take such actions as advised by AXIS to remove or to minimize AXIS's exposure" in connection with those extra-contractual actions, *see* Sep. Appx. 16, PMA § 7.1.

American Specialty acted as AXIS's managing general agent for primary liability policies and also excess and umbrella liability policies

9

(which provide coverage for losses that exceed the limits of their under-lying primary policies). *See, e.g.*, Sep. Appx. 56. As to excess or umbrella policies, AXIS initially authorized American Specialty to act as AXIS's managing general agent through an Excess Underwriting Guidelines Addendum effective May 20, 2010. *Compare* Sep. Appx. 46, *with* Sep. Appx. 55-64 ("Excess Underwriting Guidelines Addendum"); *see also* Dkt. 235-8, 34:10-35:15; Dkt. 263-5, 32:20-33:12. Even under the 2010 Excess Underwriting Guidelines Addendum, however, American Specialty had no authority—without express approval from AXIS—to solicit, quote, under-write, bind, or issue any excess policies for, among other things, low- or medium-hazard group accounts with general liability policy premiums in excess of $25,000 or for any NFL team. *See, e.g.*, Dkt. 263-2, 41:13-23, 42:13-25; Dkt. 263-1; Dkt. 263-2, 50:22-51:14, 53:3-15 (authenticating Dkt. 263-1); Dkt. 263-5, 42:17-45:8 (testifying Dkt. 263-1 reflects limits of American Specialty's excess underwriting authority); Dkt. 263-3; Dkt. 263-4; Dkt. 263-5, 44:22-45:8 (authenticating Dkt. 263-4); Dkt. 263-6; Dkt. 263-5, 47:12-51:9; Dkt. 229-15 at 2 (identifying "NFL professional team" as basis for referring Buccaneers' 2013 policies to AXIS); Dkt. 229-36, Resp. No. 1 (authenticating Dkt. 229-15); Dkt. 263-2, 49:21-50:7.

## III.   American Specialty's Issuance of the 2013 Policies

In early May 2013, American Specialty learned from insurance broker Marsh USA, Inc., that the Buccaneers were looking "to renew the [team's insurance] program with expiring coverages," including excess EL coverage, without any exclusion for concussion-related injuries. Dkt. 263-9 at 1-2; *see also* Dkt. 263-5, 57:3-58:16; Dkt. 263-7, 121:9-14; Dkt. 263-8; Dkt. 263-10, 36:13-37:1. To that end, the Buccaneers provided American Specialty with an application, which included information about the team's then-current primary EL policy—a policy another insurance company, Great Divide, had issued for the period from July 4, 2012 through July 4, 2013, with limits of $1,000,000. *See* Dkt. 263-9 at 3; Dkt. 263-10, 39:10-22 (authenticating Dkt. 263-9).

This in turn triggered American Specialty's contractual obligation to refer a proposal for the Buccaneers' coverages to AXIS, both because American Specialty's estimated premium for the proposed general liability policy exceeded the $25,000 threshold and because the Buccaneers are an NFL team. *See* Dkt. 229-15 at 2; Dkt. 263-5, 87:19-88:4. But when American Specialty did so, it omitted certain material information—namely, that that the Buccaneers were seeking excess EL coverage, and

without a concussion exclusion. *See generally* Dkt. 229-15; *id.* at 11 (American Specialty's excess premium computation worksheet, failing to list underlying EL policy); Dkt. 263-12, 80:23-81:2 (testifying "there was no indication about employer's liability as presented" in referral); Dkt. 263-13; Dkt. 263-12, 73:21-74:8, 78:1-15 (authenticating Dkt. 263-13 and testifying that request for excess EL would have appeared on excess premium computation worksheet); Dkt. 263-5, 103:17-104:19 (not disputing American Specialty underwriter's testimony that whether excess policy extended excess EL coverage could affect pricing of excess policy); *compare also* Dkt. 263-8, *with* Dkt. 263-9; Dkt. 263-10, 40:23-41:20.

Thus, when AXIS ultimately approved American Specialty's referral, it did so based on the belief and expectation that American Specialty would not be issuing excess EL coverage to the Buccaneers. *See* Dkt. 263-11 (approving referral); Dkt. 263-2, 89:4-18 (authenticating Dkt. 263-11); Dkt. 263-12, 98:13-17. Yet, despite having received no authorization from AXIS to underwrite, propose, bind, or issue excess EL coverage to the Buccaneers, American Specialty offered and bound that coverage for the team anyway. Dkt. 229-9 at 1; Dkt. 229-28, 110:14-20 (authenticating Dkt. 229-9); *see also, e.g.*, Dkt. 139, ¶ 77; Dkt. 263-2, 117:7-118:10

(testifying American Specialty agreed to issue excess EL coverage with the excess policy proposal). In both the proposal and the binder for the excess policy, under the Schedule of Controlling Underlying Insurance, American Specialty listed the primary layer EL policy as "TBD"—indicating, according to American Specialty, that excess coverage would in fact be provided. Dkt. 229-6 at 4; Dkt. 229-7 at 4; Dkt. 229-36, Resp. Nos. 5, 8 (authenticating Dkt. 229-6, Dkt. 229-7); Dkt. 263-7, 121:16-21, 133:14-21, 124:10-21 (repeatedly testifying excess policy proposal and excess policy binder "show EL as an underlying coverage"); Dkt. 235-4; *see also* Dkt. 139, ¶¶ 83, 86.

Ultimately, however, when American Specialty issued the final excess policy, the policy's Schedule of Controlling Underlying Insurance identified the primary layer EL policy as "N/A." Dkt. 229-8 at 8; Dkt. 229-36, Resp. No. 6 (authenticating Dkt. 229-8); Dkt. 254-2, 87:17-25, 121:24-122:11 (testifying American Specialty prepared the excess policy). So although the Buccaneers believed, based on American Specialty's conduct and representations, that the team had purchased and would be receiving excess EL coverage, *see* Dkt. 235-27 at 3, the excess policy that American Specialty actually issued differed from the excess proposal and

binder; the proposal and binder noted excess EL coverage was "TBD" (which, as American Specialty has confirmed, was intended to reflect there would be excess EL coverage), while the policy said "N/A" (which indicated there would be no such coverage). *See, e.g.*, Dkt. 263-12, 83:7-18, 87:14-87:22, 92:22-93:18; Dkt. 229-36, Resp. No. 7 (denying that excess policy fails to schedule underlying EL policy); Dkt. 235-8, 175:20-176:15 (explaining that when American Specialty issued the excess policy binder, "the expectation was that [it was] going to bind employer's liability on the excess policy").[2]

## IV. The Tynes Claim

In March 2015, the Buccaneers' former placekicker, Lawrence Tynes, alleged he had contracted a career-ending MRSA infection at a Buccaneers facility in 2013. *See, e.g.*, Dkt. 229-12 at 4; Dkt. 229-34, 30:5-32:9 (authenticating Dkt. 229-12); Dkt. 139, ¶ 97. MRSA, which is short for Methicillin-resistant *Staphylococcus aureus*, causes a type of staph

---

[2] In May 2014, the broker that the Buccaneers engaged to replace Marsh, BKS, again notified American Specialty that American Specialty had "left [EL coverage] off" of the excess policy. *See* Dkt. 229-10; Dkt. 229-33, 75:1-10 (authenticating Dkt. 229-10); Dkt. 229-11 at 1; Dkt. 229-33, 77:6-78:9 (authenticating Dkt. 229-11). American Specialty did not notify AXIS of this communication before AXIS initiated this action; AXIS discovered it only after it filed suit. *See, e.g.*, Dkt. 229-33, 77:6-78:9; Dkt. 229-28 135:21-137:21.

infection that is difficult to treat because of its resistance to some antibiotics.[3] The Great Divide primary EL policy covered the time period when Tynes's claim arose, and the AXIS general liability policy therefore excluded coverage of EL claims. *See, e.g.*, Dkt. 229-13; Dkt. 229-32, 46:17-48:12 (authenticating Dkt. 229-13); Dkt. 229-29, 222:25-223:4; Dkt. 139, ¶ 98; Dkt. 235-16 at 5.

On March 5, 2015, American Specialty notified AXIS of the Tynes claim. *See, e.g.*, Dkt. 229-12 at 1; Dkt. 139, ¶ 99. In response, on March 24, 2015, AXIS promptly denied the Buccaneers coverage for the Tynes claim under the general liability and excess policies—it denied coverage under the former, in part, because of the policy's EL exclusion, and it denied coverage under latter because there was no EL coverage on the face of the policy. *See* Dkt. 235-16.

American Specialty was responsible for handling the Tynes claim until April 8, 2015, at which time AXIS took over the handling of the claim and instructed American Specialty that, going forward, it would be responsible for attending to only certain administrative duties with

---

[3]  *See, e.g.*, Centers for Disease Control & Prevention, https://www.cdc.gov/mrsa/index.html (all websites last viewed July 14, 2023).

respect to the claim. *See* Dkt. 229-38, Resp. No. 12; Dkt. 230 at 2, ¶ 3(c) (authenticating Dkt. 229-38). AXIS assumed handling of the Tynes claim pursuant to certain provisions of the PMA, which, among other things authorize AXIS to (a) "override [American Specialty] in the adjustment and settlement or rejection of any claim," (b) "assume or direct the handling and settlement of any individual claim," and (c) handle, in the manner it directs, any claim that, like the Tynes claim, involves or is expected to involve a potential loss that exceeded American Specialty's authority, or a written settlement demand in excess of policy limits. Sep. Appx. 68-69, 96-99, Claims Agmt. §§ 4.1, 4.2, Am. No. 3; *see also* Dkt. 235-18 at 2-3 (explaining AXIS was "assuming handling of [the Tynes claim]," "[g]iven the alleged exposure" associated with it). AXIS had no knowledge of any potential coverage dispute with the Buccaneers at the time it assumed these claim-handling responsibilities. *See, e.g.*, Dkt. 229-14 (reflecting American Specialty's first notifying AXIS of excess EL coverage question on April 17, 2015).

## V.     The Team's Initial Assertion of Excess EL Coverage

After AXIS denied the Buccaneers coverage for the Tynes claim, Marsh contacted American Specialty to ask why the excess policy did not

reflect the excess EL coverage identified in the binder American Specialty had issued. *See, e.g.*, Dkt. 229-14 at 2; Dkt. 229-36, Resp. No. 10 (authenticating Dkt. 229-14); Dkt. 139, ¶ 101. Upon receiving Marsh's inquiry, American Specialty's underwriters discussed internally their belief that they had intended, but failed, to provide the Buccaneers excess EL coverage in 2013. Dkt. 229-14 at 1-2 (reflecting excess policy underwriter's statement to American Specialty's Chief Underwriting Officer that "EL was shown on the application, proposal and binder – then seemed to drop of[f] the planet when the policy was issued," and "i[t was] very clear that it should [have been] on the policy as well").

Four days later, American Specialty wrote AXIS to explain that it had made a mistake in issuing the excess policy without scheduling the Buccaneers' underlying EL insurance, which was necessary for providing excess EL coverage. *See* Dkt. 229-14 at 1. To fix the mistake, American Specialty asked AXIS to provide the Buccaneers the missing coverage. *See id.*

On May 4, 2015, AXIS's outside counsel responded to American Specialty's communication and explained that American Specialty lacked authority to issue excess EL coverage to the Buccaneers in 2013 without

17

AXIS's approval (which it never had obtained) and therefore that AXIS would not be reforming the excess policy to provide the requested excess EL coverage. *See* Dkt. 229-16. AXIS's counsel also explained that, pursuant to the terms of the PMA and given the fact that AXIS had assumed handling of the Tynes claim, American Specialty had no authority to make any determinations with respect to any coverage issues. Dkt. 229-16; Dkt. 229-29, 161:5-163:7 (authenticating Dkt. 229-16). AXIS also notified American Specialty of its intent to enforce its indemnification rights against American Specialty "for any consequential damages suffered by AXIS as a result of the underwriting of the AXIS excess policy." Dkt. 229-16 at 2.

Ten days later, American Specialty's chief underwriting officer emailed AXIS a second time. Dkt. 229-17; Dkt. 229-36, Resp. No. 11 (authenticating Dkt. 229-17). He reiterated that American Specialty had intended to schedule excess EL coverage for the Buccaneers but had erroneously failed to do so and again requested that AXIS reform the excess policy to provide that coverage. *See* Dkt. 229-17. AXIS occasionally refers in this brief to American Specialty's April 17, 2015 and May 14, 2015 emails together as the "2015 Mistake Emails."

In response, AXIS did not reform the excess policy, and on June 4, 2015, it advised American Specialty for a second time that it would seek indemnification for any loss AXIS might suffer in connection with American Specialty's error in underwriting the excess policy. *See, e.g.*, Dkt. 229-18; Dkt. 229-30, 217:11-16 (authenticating Dkt. 229-18); Dkt. 139, ¶ 111. AXIS also requested that American Specialty confirm it had put its errors and omissions insurance carrier on notice of its mistake. *See* Dkt. 229-18 at 3. American Specialty never responded. *See, e.g.*, Dkt. 229-21 at 2; Dkt. 229-28, 187:20-191:19 (authenticating Dkt. 229-21).

## VI. The Tynes Litigation and the Buccaneers' Additional Demand for Coverage

Tynes sued the Buccaneers and the owner of the team's practice facility on May 7, 2015 in Florida and sought over $20 million in damages. *See, e.g.*, Dkt. 229-19;[4] Dkt. 139, ¶ 115. The parties litigated that action throughout 2015 and 2016. *See, e.g.*, Dkt. 229-39; Dkt. 230 at 2, ¶ 3(d)) (authenticating Dkt. 229-39);[5] Dkt. 139, ¶ 116. While AXIS was

---

[4]  The Court may take judicial notice of this court record under Rule of Evidence 201. *See, e.g.*, *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (taking judicial notice of publicly filed court records).

[5]  The docket for the Tynes litigation also is available through the Florida state

never a party to the Tynes litigation, *see generally* Dkt. 229-39, it did provide a defense to the owner of the Buccaneers' practice facility under the team's general liability policy until that party settled Tynes's premises liability claim against it. *See, e.g.*, Dkt. 235-18; Dkt. 235-20 at 2. For its part, Great Divide provided a defense to the Buccaneers throughout the entirety of the Tynes litigation under the team's primary EL policy. Dkt. 229-31, 148:15-22; Dkt. 229-26 at 3; Dkt. 229-31, 246:4-9 (authenticating Dkt. 229-26); Dkt. 229-13 at 3; Dkt. 139, ¶ 98.

In September and October 2016, the Buccaneers advised AXIS, American Specialty, and Marsh that the team expected the Tynes claim to exhaust the Great Divide policy; demanded that AXIS reform the excess policy to provide for excess EL coverage; and requested that they all participate in a mediation that had been ordered by the court overseeing the Tynes litigation. *See* Dkt. 229-20; Dkt. 229-34, 75:7-77:13 (authenticating Dkt. 229-20); Dkt. 229-21 at 7-12; Dkt. 139, ¶¶ 118-19.[6] In response, American Specialty acknowledged the September 13, 2016 letter

---

court's website at https://hover.hillsclerk.com/html/case/caseSearch.html.

[6]     At the time the Buccaneers sent their October 5, 2016 letter, the mediation was to occur by November 18, 2016. *See* Dkt. 229-21 at 7. Ultimately, however, the parties scheduled the mediation to take place on December 19, 2016. *See, e.g.*, Dkt. 229-21 at 3.

from the Buccaneers, though it did not contact AXIS about the Buccaneers' demands. *See* Dkt. 229-20.

## VII. AXIS's Additional Notice to American Specialty Regarding the Tynes Claim

In response to the Buccaneers' fall 2016 letters demanding coverage for the Tynes claim under the excess policy, AXIS advised the Buccaneers on November 7, 2016 that it would not reform the excess policy to provide the requested coverage. *See* Dkt. 229-21 at 4-6. Separately, AXIS also sent letters to Marsh and American Specialty notifying both of its response to the Buccaneers and explaining its view that any loss it suffered in connection with the Buccaneers' pursuit of excess EL coverage would be a consequence of American Specialty's breaches of the PMA. *See id.* at 2-6. AXIS also reiterated—for a third time—its expectation that American Specialty would honor its contractual obligation to indemnify AXIS for any such losses. *See id.* at 3. Finally, AXIS expressed interest in exploring a "negotiated solution" to the Buccaneers' demands "for an amount significantly lower" than Tynes's $20 million damages claim and requested to meet with American Specialty and Marsh in connection with the upcoming court-ordered mediation to discuss whether there was a pathway to informally resolving the Tynes claim. *Id.* AXIS included with

its November 2016 letter copies of the letters it previously had received from the Buccaneers, its November 7, 2016 response to the Buccaneers, and a copy of the June 2015 notice it previously had sent to American Specialty. *See id.* at 4-15. AXIS also, again, reserved all of its rights under the PMA. *See id.* at 3.

Marsh responded to AXIS's November 2016 letter approximately ten days later, copying the Buccaneers and American Specialty. *See* Dkt. 229-22. In its letter, Marsh refused AXIS's requests to meet and to attend the mediation in the Tynes litigation, asserted that American Specialty and the Buccaneers always had intended the excess policy to provide excess EL coverage, and insisted that AXIS reform the excess policy to provide that coverage. *See* Dkt. 229-22; Dkt. 229-32, 112:14-113:6 (authenticating Dkt. 229-22).

Although it is undisputed American Specialty received AXIS's November 2016 letter, American Specialty once again chose to ignore AXIS and did not respond. *See* Dkt. 229-31, 109:9-110:3; Dkt. 259 at 12, ¶ 24; *see also, e.g.*, Dkt. 229-23 at 1 (referencing Marsh's response to November 2016 letter). Instead, more than a month after receiving AXIS's November 2016 letter, and one week before the parties were scheduled to

mediate the Tynes claim, American Specialty, through its counsel, responded to Marsh's November 18, 2016 letter, copying counsel for AXIS. *See* Dkt. 229-23; Dkt. 229-36, Resp. No. 12 (authenticating Dkt. 229-23). Contrary to its earlier assertions to AXIS that it had made a mistake in issuing the policy without excess EL coverage, American Specialty insisted to Marsh that American Specialty never had intended to schedule EL coverage on the excess policy after all. *See* Dkt. 229-23.

Marsh responded to American Specialty the next day, copying counsel for AXIS and the Buccaneers. *See* Dkt. 229-24; Dkt. 229-28, 192:4-13, 197:11-198:1 (authenticating Dkt. 229-24). Marsh again referenced AXIS's November 2016 letter; accused American Specialty of making negligent misrepresentations in soliciting, quoting, underwriting, binding, and issuing the Buccaneers' 2013 general liability and excess policies; and reiterated its expectation that AXIS and American Specialty would "fulfill their contractual obligations to the [Buccaneers] and work to achieve a settlement of the *Tynes* claim without further delay." Dkt 229-24 at 2.

Nearly a week later, and on the very same day as the mediation in the Tynes litigation, American Specialty's counsel replied to Marsh and

disputed Marsh's assertions. *See* Dkt. 229-25; Dkt. 229-28, 192:4-13, 199:3-19 (authenticating Dkt. 229-25). American Specialty did not copy AXIS or the Buccaneers on this communication. Nor did American Specialty ever respond to AXIS's June 2015 or November 2016 letters or communicate with AXIS about or participate in the mediation of the Tynes claim. *See, e.g.*, Dkt. 239 at 3, ¶ H. More, at no time did American Specialty:

- acknowledge its indemnity obligations to AXIS under the PMA,

- assert that it had any right to control AXIS's response to the Buccaneers' claims of entitlement to excess EL coverage and demands for reformation, or

- object to AXIS's evaluation of participating in a potential settlement of the Tynes claim.

## VIII. The Mediation and Resolution of the Tynes Claim

In December 2016, AXIS and Great Divide, which was still defending the Buccaneers under the team's primary EL policy, participated in mediation in the Tynes litigation. *See, e.g.*, Dkt. 229-28, 191:7-19; Dkt. 139, ¶ 125; Dkt. 229-31, 148:15-22; Dkt. 244-1 at 3; Dkt. 229-31, 246:4-9 (authenticating Dkt. 244-1).[7] By that point in the Tynes

---

[7] AXIS redacted the amount of its contribution to settle the Tynes claim from its April 25, 2017 arbitration demand that it sent American Specialty, *see* Dkt. 244-

litigation, Tynes was claiming damages in excess of $20 million, the state trial court had denied the defendants' motion to dismiss, and the parties were scheduled to try Tynes's claims before a Florida jury in June 2017. *See, e.g.*, Dkt. 229-39; Dkt. 229-21 at 10.

American Specialty had never communicated with AXIS after sending the 2015 emails in which it insisted that it had mistakenly issued the excess policy without excess EL coverage. AXIS thus was unaware at the time of the Tynes mediation that American Specialty no longer believed its issuance of the excess policy without EL coverage was a mistake or that the Buccaneers' broker had acknowledged the absence of excess EL coverage. *But see, e.g.*, Dkt. 263-7, 102:2-103:12, 115:15-119:10, 122:1-9, 137:20-138:11 (American Specialty's underwriter's testifying that she remains unsure whether the excess policy's lack of excess EL coverage "was a mistake or . . . was intentionally taken off" but that she no longer believes the absence of excess EL coverage under the excess policy was a "clerical error" or "mistake"); Dkt. 263-2, 102:9-15, 120:2-11, 122:11-21, 127:17-128:10 (expressing uncertainty as to reason excess policy binder

---

1, because that amount is confidential under the agreement that AXIS and the Buccaneers entered into to memorialize the settlement. *See, e.g.*, Dkt. 216 (discussing settlement amount as confidential settlement term).

was issued with underlying EL policy denoted as "TBD" and asserting American Specialty made no mistake in issuing excess policy).

Thus, in evaluating the risks associated with the Buccaneers' assertion that the team was entitled to EL coverage under the excess policy for the Tynes claim, AXIS considered the 2015 Mistake Emails to be one of its biggest weaknesses in any defense to a potential reformation claim brought by the Buccaneers. *See, e.g.*, Dkt. 235-7, 31:14-33:13, 184:18-185:23 (confirming AXIS considered as part of its settlement analysis that American Specialty's employees could have been deposed in any coverage dispute and the 2015 Mistake Emails created "an adverse record to AXIS's coverage position" and were "the most damaging evidence against [its] coverage position"); Dkt. 263-14, 57:7-59:14 (explaining American Specialty's assertions in the 2015 Mistake Emails were "incorrect" and "controvert[ed]," and imperiled AXIS's coverage position).

Ultimately, the parties confidentially settled the Tynes claim, and AXIS contributed to that settlement. *See, e.g.*, Dkt. 239. AXIS's payment was a fraction of the amount Tynes was demanding ($20 million) and well below the limits of the excess EL policy the Buccaneers were asserting AXIS should have reformed to provide the team coverage for the claim

($10 million). *Compare, e.g.*, Dkt. 239 at 3, ¶ K (documenting AXIS's contribution to the Tynes settlement) *with, e.g.*, Dkt. 229-19, ¶ 1 (alleging damages in excess of $20 million).

## IX. AXIS Seeks Redress from American Specialty for the Coverage Dispute.

After the Tynes litigation ended, AXIS sought indemnity from American Specialty for the losses it incurred in connection with the Tynes claim. As discussed in more detail momentarily, Section 27 of the PMA contains American Specialty's indemnity obligations to AXIS, as well as the parties' agreed indemnification procedures. *See* Sep. Appx. 29, §§ 27.4, 27.6; *see also* Dkt. 139, ¶¶ 37-40. The PMA also specifies that Indiana law governs any dispute between the parties. *See* Sep. Appx. 32, § 30.1, Sep. Appx. 38, § 30.

On April 25, 2017, in accordance with the PMA and following up on its May 2015, June 2015, and November 2016 notices, AXIS demanded that American Specialty indemnify it for the mistakes it made as to the excess policy—mistakes that caused AXIS to incur losses in connection with the Tynes claim. *See, e.g.*, Dkt. 244-1; Dkt. 139, ¶ 112. When American Specialty refused to honor its contractual obligation, AXIS initiated arbitration against American Specialty. Dkt. 139, ¶¶ 6, 131; Dkt. 229-26.

The parties later agreed to dismiss the arbitration and move their dispute to the U.S. District Court for the Northern District of Indiana. *See* Dkt. 31.

The parties filed cross-motions for summary judgment.[8] Following argument, the District Court granted American Specialty's summary judgment motion, denied AXIS's motion for partial summary judgment "to the extent coextensive with American Specialty's motion," and denied as moot the remainder of AXIS's motion. SA 15. Citing non-Indiana authority, untethered to any language in the PMA, the District Court held that AXIS's contractual indemnification right was contingent on its having formally tendered a defense to American Specialty of the Buccaneers' potential reformation claim under the excess policy, or, in the alternative, having given American Specialty an opportunity to "participate[] in the negotiations and approve[] the agreement." *Id*. at 9. Otherwise, the District Court held, American Specialty was obligated to indemnify AXIS only if AXIS proved its "actual liability" to the Buccaneers. *Id*. Finding

---

8   AXIS moved for partial summary judgment on five of American Specialty's affirmative defenses: those asserting the doctrine of unclean hands (No. 3), set-off (No. 17), an obligation to litigate to "exhaustion" either standing alone or through a failure-to-mitigate framing (Nos. 4, 16), and prior material breach (No. 7). *See* Dkt. 245 at 13-23.

enough facts undisputed to hold that AXIS satisfied none of these standards, the District Court concluded AXIS's choice to contribute to the settlement of the Tynes claim was "voluntary," such that AXIS could not show that any losses it alleged it suffered in connection with the Tynes claim were caused by American Specialty, and American Specialty thus was entitled to summary judgment on AXIS's claim. SA 1, SA 5-13, SA 15.

The District Court did not address any other arguments American Specialty made in support of its summary judgment motion. *See generally* SA 1-15. Nor did the court specifically address any of AXIS's arguments in support of its own cross-motion for partial summary judgment that the court did not consider "coextensive" with its analysis of American Specialty's causation argument. *See id*. AXIS thus understands the District Court to have rejected on the merits only its arguments as to American Specialty's Affirmative Defense Nos. 4 and 16. *See, e.g.*, Dkt. 260 at 7 (arguing these affirmative defenses assert AXIS cannot prevail on its contract claim because its settlement contribution was "voluntary"); Dkt. 272 at 10.

This appeal followed.

## SUMMARY OF THE ARGUMENT

The District Court came to the wrong conclusion based on a wrong understanding of Indiana law. To enforce a contractual right of indemnification for a settlement payment, the party seeking indemnification (the "indemnitee") must show only three things: (1) it complied with the terms of the parties' indemnification agreement, (2) the settlement was not "voluntary," and (3) the party who is claimed to owe indemnification (the "indemnitor") received notice and an opportunity to participate in the settlement, or the terms of the settlement were fair and reasonable.

The undisputed evidence demonstrates that all three of these requirements are satisfied in this case. As to the first requirement, the terms of the PMA do not condition AXIS's contractual right to indemnification on a tender of defense, which would include the opportunity to control, and thus approve, any settlement. Instead, the PMA required AXIS *only* to provide notice of its claim for indemnification. AXIS did just that, and American Specialty has never argued otherwise.

As to the second requirement—voluntariness—AXIS demonstrated that it was objectively reasonable for it to believe it was at risk of potential liability at the time it contributed to the Tynes settlement. American

Specialty had twice stated, in writing, that it had made a mistake in issuing the Buccaneers' excess policy without excess EL coverage and asked AXIS to reform the policy to fix that mistake. That, plus the fact that the not even American Specialty disputes the legitimacy of the Tynes claim, is enough under Indiana law to establish that AXIS's contribution to the settlement was not "voluntary." If an insured can show that both it and the insurer (or, here, the insurer's agent) intended for a policy to reflect certain coverage, such that the absence of that coverage under the policy is the result of a mutual mistake, the policy may be reformed to conform to the insured's expectations.

American Specialty's decision to ignore AXIS's repeated notices of its intent to seek indemnification for any losses stemming from the Tynes claim and related coverage dispute, and AXIS's request for American Specialty to participate in the settlement discussions of the Tynes claim, estops American Specialty from challenging the fairness and reasonableness of the amount AXIS contributed to the Tynes settlement. An indemnitor cannot complain about the settlement of a claim when it knows there will be a mediation for the purpose of settling the claim and chooses not to participate. But even if American Specialty were not so estopped,

31

it is undisputed that AXIS's contribution to the Tynes settlement was in fact reasonable. AXIS's contribution to the settlement represents a mere fraction of Tynes's $20 million damages demand (for a disease he unquestionably contracted while playing for the Buccaneers) and forestalled a threatened (and potentially expensive) coverage lawsuit brought by the Buccaneers.

Because the relevant Indiana law is clear and controlling, the District Court's reliance on authority from other jurisdictions to impose additional conditions on AXIS's indemnification right—and in particular the duty to tender a defense to American Specialty or show it had actual liability to the Buccaneers—was contrary to law and erroneous. But even if Indiana law permitted the District Court to read unwritten conditions on AXIS's contractual indemnity right into the PMA, and it does not, the legal rules the District Court imported from other jurisdictions are irreconcilable with Indiana law. Because AXIS satisfied all of its obligations under Indiana law to pursue its contractual indemnification rights against American Specialty, the District Court's order should be reversed, and AXIS should be awarded summary judgment on American Specialty's Affirmative Defense Nos. 4 and 6.

## STANDARD OF REVIEW

The Court reviews the District Court's grant of summary judgment *de novo. See, e.g., Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). In evaluating American Specialty's motion for summary judgment, the Court construes all facts and inferences in AXIS's favor and will reverse the District Court's grant of summary judgment for American Specialty unless it finds that the record establishes "no genuine issue as to any material fact," and American Specialty is "entitled to judgment as a matter of law." *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 844 (7th Cir. 2015).

# ARGUMENT

Under Indiana law, to obtain indemnification under the PMA for all losses it incurred in connection with the Tynes claim and the related coverage dispute, AXIS was required to do only three things: (1) comply with the PMA's terms, (2) establish that its contribution to the Tynes settlement was not "voluntary," and (3) show that it gave American Specialty notice and an opportunity to participate in the settlement discussions, or, alternatively, that the amount it contributed to the Tynes settlement was fair and reasonable. At summary judgment, American Specialty did not claim AXIS had failed to comply with the terms of the PMA; it challenged only the second and third requirements, arguing that AXIS's contribution to the Tynes settlement was both voluntary and unreasonable. *See* Dkt. 233 at 9-14; Dkt. 268 at 2-6. Because neither is true, and because AXIS undisputedly satisfied its obligations under the PMA, American Specialty must indemnify AXIS for its contribution to the Tynes settlement.

## I. AXIS Complied with the Indemnity Agreement.

The District Court started with contract principles, *see* SA 5, and therefore so do we. The first requirement under Indiana law for obtaining indemnification is compliance with the relevant indemnification

agreement. *See, e.g.*, *Plumlee v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 359 (Ind. Ct. App. 1995) ("Where the terms of a[n indemnity] contract are clear and unambiguous, the terms are conclusive and this court will not construe the contract or look at extrinsic evidence; rather [it] will merely apply the contractual provisions."). Here, the plain language of the PMA governs AXIS's right to indemnification and its attendant obligations to preserve that right. The key provisions (which refer to American Specialty as the "Program Manager") are reproduced here:

27.4    Indemnification and Hold Harmless by the Program Manager.  At all times hereafter, the Program Manager agrees to defend, indemnify, and hold AXIS harmless from and against all claims, actions, causes of action, liability or loss which result from any negligent or wilful acts, errors or omissions of the Program Manager, or its servants and employees in the performance or breach of duties under this Agreement.  The Program Manager also agrees to defend, indemnify, and hold AXIS harmless from and against all claims, actions, causes of action, liability or loss which result from any negligent or wilful acts, errors or omissions of any representatives, sub-producers, producers or brokers who are retained by the Program Manager to perform any duties of the Program Manager under this Agreement or to whom the Program Manager delegates any of its authority under this Agreement. The Program Manager further agrees that in the event AXIS is in violation of any state code, statute, regulation or bulletin due to the negligent or wilful acts, errors or omissions of the Program Manager or its servants and employees, and any representatives, sub-producers or producers who are retained by the Program Manager to perform any of the Program Manager's duties hereunder or to whom the Program Manager delegates any of its authority under this Agreement, then the Program Manager shall assume the responsibility and liability for such act and shall indemnify and hold AXIS harmless for such liability and loss.  Loss shall include, but not be limited to, all damages, costs, expenses, reasonable attorneys' fees and other legal fees, penalties, fines, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible by law) and any other expense or expenditure incurred by AXIS.

This Section 27.4 shall survive termination of this Agreement.

\* \* \* \* \*

27.6    Indemnification Procedures.  Upon the assertion by any third party of any claim that may give rise to liability for which the Program Manager or AXIS may have an obligation to indemnify the other party under Section 27.4 or 27.5, the party seeking indemnifications shall promptly notify the other party, in writing, of the existence of such claim and the indemnity claimed; provided, however, that failure to give timely notice shall not be deemed to be a waiver of the claim to the extent that the indemnifying party has not been prejudiced by such failure to give timely notice.

Sep. Appx. 29-30, §§ 27.4, 27.6. Nothing in these provisions or elsewhere in the PMA conditions AXIS's right to indemnification on a tender of defense (which would entail the right to control, and thus approve, any settlement) or, barring that, on proving actual liability. Not even American Specialty argued otherwise below. *See generally* Dkt. 233; Dkt. 268. It was therefore error as a matter of law for the District Court to read into the PMA a "tender-or-actual-liability" requirement.

### A.    AXIS Argued Below and Is Entitled to Argue Here that the PMA Did Not Require it to Tender a Defense.

Before discussing the merits in more detail, we address a threshold matter: the District Court's mistaken claim, relegated to a footnote, that AXIS "never argue[d] that [the PMA] required something less than the tender of defense." SA 10 at n.3. That is simply not so. AXIS argued this point explicitly. *See* Dkt. 264 at 13. In its summary judgment response, AXIS explained that American Specialty's insistence that AXIS was required to tender a defense "is [in]consistent with the parties' agreement, which does not condition indemnification on any sort of 'tender,' or on American Specialty having an opportunity to conduct the defense." *Id*. In support of that express argument, AXIS cited not only the PMA itself but Indiana law, including among other authorities *Henthorne v. Legacy*

*Healthcare, Inc.*, 764 N.E.2d 751, 759 (Ind. Ct. App. 2002), which rejected an indemnitor's argument that its obligation to defend or indemnify an indemnitee was contingent on the indemnitee demanding, within a particular time period, a defense or indemnification when the parties' contract did not require it.

This does not amount to a forfeiture under this Court's caselaw. *See, e.g., Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636, 645 (7th Cir. 2022) (rejecting waiver argument and confirming parties may refine arguments on appeal); *In re Calvert*, 913 F.3d 697, 701 (7th Cir. 2019) (rejecting forfeiture even as to generalized arguments because it "is not an overly technical appellate hurdle" (quotations and citation omitted)).[9] And even if it did, it is "well settled" that the rule against addressing forfeited arguments "does not prevent a party from attacking on appeal the legal theory upon which the district court based its decision." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) (citing several cases, including cases decided on summary judgment). It would be "folly"

---

[9] In fact, it is **American Specialty** that failed to argue, either in its opening or reply briefs below, that the parties' contract explicitly requires AXIS to tender a defense to preserve its indemnification rights. *See* Dkt. 233 at 8-14; Dkt. 268 at 2-6. So, if any party forfeited an argument that the terms of the PMA require a tender of defense in this situation, it was American Specialty, not AXIS.

for American Specialty to argue otherwise. *United States v. City of Chicago,* 869 F.2d 1033, 1036 (7th Cir. 1989).

**B.    The District Court Erred in Reading into the Indemnity Agreement Requirements that the Agreement Does Not Contain.**

As the District Court itself recognized, *see* SA 5, like all contracts in Indiana, contracts for indemnification must be enforced according to their plain terms; they cannot be rewritten by the courts. *See, e.g.*, *Bethlehem Steel Corp. v. Sercon Corp.*, 654 N.E.2d 1163, 1168 (Ind. Ct. App. 1995) ("Parties to a contract have the right to define their mutual rights and obligations, and courts may not write a new contract."); *TLB Plastics Corp. v. Procter & Gamble Paper Prod. Co.*, 542 N.E.2d 1373, 1377 (Ind. Ct. App. 1989) ("[I]f the words of an indemnity agreement are clear and unambiguous, they are to be given their plain and ordinary meaning."). Consistent with this rule, as well as Indiana's policy favoring freedom to contract, Indiana courts have repeatedly declined to read unwritten terms or conditions into indemnity agreements, even in the face of arguments that public policies favor their doing so. *See, e.g.*, *Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, PC*, 929 N.E.2d 838, 851 n.13 (Ind. Ct. App. 2010) (rejecting argument indemnity terms

should be implied into commercial contract between sophisticated entities); *Mead Johnson & Co. v. Kenco Grp., Inc.*, 899 N.E.2d 1, 4 (Ind. Ct. App. 2009) (declining to read unwritten limitation on indemnity obligation into indemnification clause); *Henthorne*, 764 N.E.2d at 759 (declining to condition contractual indemnity right on demand requirement absent from agreement); *U.S. Fid. & Guar. Co. v. Ozdemir*, No. 1:08-CV-1501-RLY-DML, 2010 WL 1325571, at *2 (S.D. Ind. Mar. 30, 2010) (similar to *Mead*).

Out-of-state precedent also supports reading indemnification agreements as-is, without superimposing additional, unstated obligations on an indemnitee, including an unstated obligation to tender a defense. *See, e.g.*, *Smith v. Hartman Walsh Painting Co.*, No. 1:15-CV-94, 2017 WL 3051524, at *5 & n.9 (D.N.D. June 30, 2017), *report & recommendation adopted*, No. 1:15-CV-94, 2017 WL 3037438 (D.N.D. July 18, 2017) (collecting federal appellate and district court cases for "the general rule regarding indemnity contracts . . . that tender of defense is not a precondition to reimbursement of defense costs in the absence of a specific contractual requirement"); *see also Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1221 (5th Cir. 1986) ("Where the indemnity agreement

does not require notice, the courts will not infer a notice requirement as a condition precedent to a right to recover on the indemnity contract."); *Premier Corp. v. Econ. Rsch. Analysts, Inc.*, 578 F.2d 551, 554 (4th Cir. 1978) (rejecting argument indemnitee's failure to provide formal notice precluded indemnification claim because "notice is unnecessary unless the contract of indemnity requires it").

Other aspects of Indiana law further counsel against conditioning indemnification rights on a tender of defense, in conflict with the governing agreement. It is black-letter Indiana law that "the duty to defend is a duty independent of the duty to indemnify against loss or liability." *Henthorne*, 764 N.E.2d at 757; *see also, e.g.*, *Keystone Consol. Indus., Inc. v. Emps. Ins. Co. of Wausau*, 456 F.3d 758, 762 (7th Cir. 2006) (applying similar Illinois law and advising that "although the duties to defend and to indemnify may be related, they are not necessarily mutually dependent or coextensive"). In keeping with the independent nature of the duty to indemnify, Indiana courts do not discuss the tender of a defense in connection with indemnification clauses. Instead, they define indemnity clauses to cover an obligation by one party to pay the other for damages the latter sustains, including through settlement, as a result of the

former's (or sometimes the latter's) conduct, *irrespective* of any tender obligation the contract may contain. *See, e.g.*, *Masters v. Masters*, 99 N.E.3d 711, 719 (Ind. Ct. App. 2018) (collecting Indiana authority).

Further illustrating the separation between the right of indemnification and the right of a defense, under Indiana law the obligation to indemnify does not arise until *after* "the time of payment of the underlying claim, payment of a judgment on the underlying claim, or payment in settlement of the underlying claim." *GE Cap. Info. Tech. Sols., Inc. v. Campbell Ads LLC*, No. 2:11-CV-082-PPS-APR, 2013 WL 587887, at *3 (N.D. Ind. Feb. 11, 2013) (quoting *TLB Plastics*, 542 N.E.2d at 1376-77; *see also Henthorne*, 764 N.E.2d at 757; *Essex Grp., Inc. v. Nill*, 594 N.E.2d 503, 507 (Ind. Ct. App. 1992) (dismissing indemnification claim of party that had not yet incurred damages). Meanwhile, a party's defense obligations are triggered as soon as the party claiming the defense has satisfied whatever notice obligations it bears under the parties' agreement. *See, e.g.*, *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1273 (Ind. 2009). Indeed, as *Dreaded* illustrates, contracting parties who seek to preserve a *right* to control the defense before they bear indemnification obligations may specifically contract for it. *See id.* at 1270. Absent

such an agreement, Indiana law does not tether indemnification obligations to the right to a defense.

Here, American Specialty contracted for no such language, and AXIS satisfied the condition on its indemnification rights the PMA does provide. It is undisputed that American Specialty knew about the Tynes' claim and the coverage dispute from the get-go; indeed, it is American Specialty that initially notified AXIS of both. *See* Dkt. 229-12 at 1; Dkt. 139, ¶ 99; Dkt. 229-14 at 1; Dkt. 229-17. It is also undisputed that AXIS thrice advised American Specialty that it intended to seek indemnification under the PMA for any losses it incurred in connection with the Tynes claim and the related coverage dispute. *See* Dkt. 229-16 at 2; Dkt. 229-18; Dkt. 229-21. AXIS thus did all that it was required to do under the PMA to obtain indemnification from American Specialty. *See* Sep. Appx. 29-30, §§ 27.4, 27.6. This satisfies the first requirement for obtaining indemnification under Indiana law.

## II.    The Settlement Was Not "Voluntary."

The second  requirement under Indiana law for obtaining indemnification is that the indemnitee must show that the settlement was not "voluntary." *See, e.g.*, *Progressive Constr. & Eng'g Co. v. Ind. & Mich.*

*Elec. Co.*, 533 N.E.2d 1279, 1287 (Ind. Ct. App. 1989); *Sink & Edwards, Inc. v. Huber, Hunt & Nichols, Inc.*, 458 N.E.2d 291, 297 (Ind. Ct. App. 1984); *Sequa Coatings Corp. v. N. Ind. Commuter Transp. Dist.*, 796 N.E.2d 1216, 1230 (Ind. Ct. App. 2003), *decision clarified on reh'g*, 800 N.E.2d 926 (Ind. Ct. App. 2003); *Price v. Amoco Oil Co.*, 524 F. Supp. 364, 367 (S.D. Ind. 1981) (applying Indiana law); *Vernon Fire & Casualty Ins. Co. v. Graham*, 336 N.E.2d 829, 830 (Ind. Ct. App. 1975). The settlement here was not "voluntary" in any way that matters under Indiana law.

A settlement is not "voluntary" just because the indemnitee decides to settle rather than "proceed to judgment." *Progressive*, 533 N.E.2d at 1287; *see also, e.g.*, *Bethlehem Steel*, 654 N.E.2d at 1168; Dkt. 233 at 9 (American Specialty's conceding this point). Instead, the voluntariness of a settlement turns on whether the indemnitee is "at least so potentially liable that settlement was prudent," *Consol. Rail Corp. v. Allied Corp.*, 882 F.2d 254, 257 (7th Cir. 1989) (applying Indiana law), or whether "it appears that the party was legally liable and could have been compelled to satisfy the claim," *Price*, 524 F. Supp. at 367 (quoting *Allied Mut. Cas. Corp. v. Gen. Motors Corp.*, 279 F.2d 455, 460 n.15 (10th Cir. 1960)); *see also Price*, 524 F. Supp. at 371 (finding the facts were sufficient to show

that "***potential*** liability existed" for the settling party (emphasis added));

*cf. Ohio Cas. Grp. of Ins. Cos. v. Royal-Globe Ins. Cos.*, 413 N.E.2d 678,

679 (Ind. Ct. App. 1980) (stating that subrogee is not a "volunteer" if it

"pa[ys] a debt under the colorable obligation to do so or under an honest

belief that he is bound," or "mistakenly but in good faith believes he is

liable").[10] Indeed, Indiana has long favored the "expeditious settlement

of claims and disputes," and the inability to settle and obtain indemnifi-

cation without being "absolutely certain as to primary liability" would

undermine that wise policy. *Katz*, 377 N.E.2d at 680.

The Buccaneers bore a risk of liability on Tynes's underlying negli-

gence claims; and AXIS, in turn, bore a risk of potential liability to the

Buccaneers for American Specialty's mistake in failing to provide the

team with excess EL coverage, which would have covered the Tynes

---

[10]  While *Ohio Casualty* involves subrogation, rather than indemnification, Indiana
courts have confirmed the same principles apply in the related context of subro-
gation. *See Vernon Fire*, 336 N.E.2d at 831 n.1; *see also, e.g.*, *Integrity Bio-Fuels,
LLC v. Musket Corp.*, No. 1:13-cv-00768, 2015 WL 1417849, *17 (S.D. Ind. Mar.
27, 2015) (stating that subrogee was not a "volunteer" and was entitled to subro-
gation if facts "would reasonably lead to the conclusion that it could be liable");
*Aetna Cas. & Sur. Co. v. Katz*, 377 N.E.2d 678, 679 (Ind. Ct. App. 1978) (stating
"where the circumstances would lead a reasonable man to conclude that the dam-
age was apparently caused by an incident covered by the provisions of an insur-
ance contract, there is no need for the insurer to delay the payment of the claim
for damages until all possibilities of becoming a volunteer are exhausted").

claim. The District Court concluded as much, noting that "the parties seem to recognize that an anticipated 'claim' existed, and ***certainly that potential 'liability' existed***—both of which the indemnity provision plainly cover." SA 6 at n.1 (emphasis added); *see also, e.g.*, Dkt. 229-39 (reflecting state trial court's denial of dispositive motion and imminent jury trial as of December 2016).

Florida law, which governed the underlying claims, *see, e.g.*, SA 12 at n.4, permits reformation of an insurance policy if the policy, as written, contains an error that is the product of a mutual mistake. *See, e.g.*, *Old Colony Ins. Co. v. Trapani*, 118 So. 2d 850, 852 (Fla. Dist. Ct. App. 1960); Dkt. 235-20 at 3 (citing *Trapani*). And while AXIS consistently maintained that it had not authorized American Specialty to extend excess EL coverage to the Buccaneers, American Specialty ***twice*** advised AXIS, in writing, that it believed (as AXIS's managing general agent) it had mistakenly omitted such coverage for the Buccaneers and ***twice*** insisted that AXIS (as American Specialty's principal) extend excess EL coverage to the Buccaneers to fix that mistake. *See, e.g.*, Dkt. 229-14; Dkt. 229-17. Too, in their communications asserting the team was entitled to excess EL coverage for the Tynes claim, both the Buccaneers and Marsh

45

identified other circumstantial evidence they believed demonstrated that the Buccaneers and AXIS, through their respective agents, had always intended for the Buccaneers to receive excess EL overage. *See, e.g.*, Dkt. 229-21 at 7-12; Dkt. 229-22; Dkt. 229-24. What's more, AXIS had every reason to believe a Florida court would conclude that it was bound by its managing general agent's mistakes—something American Specialty never disputed below. *See, e.g.*, *Acme Oil v. Vasatka*, 465 So. 2d 1314, 1317 (Fla. Dist. Ct. App. 1985) (confirming that when insured contracts with insurer's agent based on reasonable belief agent is acting within the scope of its authority, insurer is bound); Dkt. 229-22 at 1 (Marsh's insisting that it and the Buccaneers "justifiably relied on [American Specialty's] representations of [its] underwriting authority to bind AXIS on the terms discussed"); *see generally* Dkt. 233; Dkt. 268. And on top of all of that, the Buccaneers were threatening to file a lawsuit against AXIS for excess EL coverage absent AXIS's participation in the Tynes mediation and settlement. *See, e.g.*, Dkt. 229-21 at 11.

These undisputed facts more than amply demonstrate that AXIS's contribution to the Tynes settlement was not "voluntary." The second

requirement for obtaining indemnification under Indiana law therefore is also satisfied.

### III. American Specialty Had Notice and an Opportunity to Participate in Settlement Discussions, and Regardless AXIS's Settlement Contribution Was Fair and Reasonable.

The third requirement under Indiana law for obtaining indemnification is that the indemnitee had notice and an opportunity to participate in the settlement discussions, or, alternatively, that the amount paid in settlement was fair and reasonable. *See, e.g.*, *Progressive*, 533 N.E.2d at 1287 (explaining that so long as a settlement is not "voluntary," the only question is whether the settlement terms were "fair and reasonable"); *Sequa Coatings*, 796 N.E.2d at 1230 (holding indemnitor had "acquiesced to the settlement agreement by ignoring [the indemnitee's] repeated requests for indemnification and assistance and in defending against the litigation," and was prohibited from challenging the reasonableness of the settlement).[11] Under either or both criteria, the undisputed evidence establishes that the third requirement is met here.

---

[11] *See also Price*, 524 F. Supp. at 367-68, 372 (applying same framework); *Sink & Edwards*, 458 N.E.2d at 297 & n.3 (same); *Estate of Williams v. S. Ind. Gas & Elec. Co.*, 551 F. Supp. 2d 751, 759-60 (S.D. Ind. 2008) (same); *Bethlehem Steel*, 654 N.E.2d at 1168 (same).

### A.   American Specialty Had Notice and an Opportunity to Participate in the Mediation.

Indiana courts are loath to give indemnitors a "second bite at the apple" by "collaterally attacking the settlement amount." *Bethlehem Steel*, 654 N.E.2d at 1168. Doing so would place courts "in the untenable position of determining that [an indemnitor] has breached its agreement, then allowing the party to capitalize on its recalcitrance by failing to give effect to the parties' contract as written." *Id.* Consequently, an indemnitor who has "denie[d] liability on [the] indemnity contract" may be estopped from challenging whether settlement terms are "fair and reasonable." *Sequa Coatings*, 797 N.E.2d at 1230; *see also Sink & Edwards*, 458 N.E.2d at 297 n.3 (remanding for a "determination of whether the settlement was reasonable" and whether, as indemnitee had argued, indemnitor was "equitably estopped from challenging the amount of settlement").

In *Sequa Coatings*, for instance, the Indiana Court of Appeals held that an indemnitor that "never responded to [the indemnitee's] letters informing it of [indemnitee's] intent to enforce the indemnity clause," and "ignor[ed] [the indemnitee's] repeated requests for indemnification and assistance in defending against the litigation," was estopped from

challenging the fairness and reasonableness of the settlement amount. 796 N.E.2d at 1230. And in *Price*, the Southern District of Indiana held that an indemnitee was "entitled to settle the case for a reasonable amount" without challenge from the indemnitor when the indemnitor "was at all times aware of the indemnity agreement," was "made a third-party defendant in an effort by [the indemnitee] to enforce the indemnity," and "continued to deny the validity of the indemnity agreement" until the settlement was finalized. *Price*, 524 F. Supp. at 371-72.

The District Court erred in interpreting *Sequa Coatings*, *Sink & Edwards*, and *Price* as requiring AXIS to formally tender a claim to American Specialty or to have given American Specialty "the opportunity to defend" the Buccaneers' potential reformation claim. SA 8. Those cases say no such thing. Each court's analysis of the indemnitor's notice of and opportunity to defend the underlying claim relates solely to whether the indemnitor was estopped from challenging the fairness and reasonableness of the settlement, not whether the settlement was voluntary. *See Sequa Coatings*, 796 N.E.2d at 1230 (holding that indemnitor "acquiesced to the settlement agreement by ignoring [indemnitee's] repeated requests for indemnification and assistance in defending against the litigation");

49

*Sink & Edwards*, 458 N.E.2d at 297 (discussing notice to indemnitor in context of rule that "indemnitor who denies liability on an indemnity contract thereby confers on the indemnitee the right to exercise reasonable judgment in settling the case without further consultation with the indemnitor"); *Price*, 524 F. Supp. at 371-72 (holding that indemnitee "was entitled to settle the case for a reasonable amount if it chose to do so" after indemnitor rejected "offer to take over and defend the case"). As explained below, the District Court's premature consideration of this notice-and-opportunity question at the "voluntariness" step of Indiana's analytical framework, rather than in evaluating whether American Specialty is estopped from challenging the "fairness and reasonableness" of the terms of AXIS's settlement contribution, is irreconcilable with Indiana law.

Instead, under these cases, American Specialty is estopped from disputing the fairness and reasonableness of the terms of AXIS's contribution to the Tynes settlement. It is undisputed that American Specialty received—and then ignored—***two*** separate notices that AXIS intended to pursue its indemnification rights in connection with any losses it incurred in connection with the Tynes claim and the related coverage

dispute, as well as notice that AXIS was evaluating whether to partici-

pate in discussions regarding settlement of the Tynes claim and an ex-

plicit request that American Specialty participate in those discussions.

Even the District Court recognized that AXIS "invited American Spe-

cialty to the mediation[.]" SA 11. The District Court went on to reject that

invitation as sufficient because it believed "[n]o reasonable jury" could

have viewed it as anything other than an attempt to "hav[e] pocketbooks

at the table." *Id.* But, even setting aside the District Court's improperly

drawing inferences in American Specialty's favor as to the import of this

communication, its recognition that AXIS indisputably provided Ameri-

can Specialty notice and an opportunity to participate in the settlement

discussions is dispositive. Like the indemnitor in *Sequa Coatings*, Amer-

ican Specialty "never responded to [the indemnitee's] letters informing it

of [the indemnitee's] intent to enforce the indemnity clause." 796 N.E.2d

at 1230. And for that reason alone, as with the indemnitor in *Sequa Coat-*

*ings*, American Specialty should be estopped from challenging the rea-

sonableness of AXIS's settlement payment. *See id.*

But there is more: American Specialty also "denie[d] liability on

[the] indemnity contract." *Sequa Coatings*, 797 N.E.2d at 1230. In the

days leading up to the mediation of the Tynes claim—and indeed on the day of the mediation itself—American Specialty, in two separate letters sent to Marsh, denied any liability in connection with the excess policy, the Tynes claim, and the coverage dispute. Dkt. 229-23 (copying AXIS); Dkt. 229-25. These letters, sent to Marsh while American Specialty was ignoring AXIS's demands for indemnification, eliminate any doubt that American Specialty was refusing to accept any responsibility for, or admit any wrongdoing in connection with, any liability AXIS faced related to the absence of excess EL coverage. *See also* Dkt. 264 at 13. Thus, to the extent American Specialty is claiming AXIS should have done more to give American Specialty an opportunity to participate in the settlement conference, it can show no prejudice it suffered from those alleged inadequacies. At every turn, it rejected any obligation to indemnify AXIS and every opportunity to be involved in discussions surrounding the Buccaneers' potential coverage claim. For this additional, independent reason, American Specialty should be estopped from challenging whether settlement terms are fair and reasonable.

### B.   AXIS's Contribution to the Tynes Settlement Was Fair and Reasonable.

Even if American Specialty were not estopped from challenging the appropriateness of the amount AXIS contributed to the Tynes settlement, and it is, the undisputed facts demonstrate that the settlement was fair and reasonable in fact. *See Franklin United Methodist Home, Inc. v. Lancaster Pollard & Co.*, 909 F. Supp. 2d 1037, 1048 (S.D. Ind. 2012) (requiring indemnitee to "prove that its settlement was objectively reasonable considering the circumstances that it faced"); *Grace Vill. Health Care Facils., Inc. v. Lancaster Pollard & Co.*, No. 3:11-cv-29, 2013 WL 4012662, at *3 (N.D. Ind. Aug. 6, 2013) (noting that Indiana's "fair and reasonable" standard is "an objective standard").

Tynes was demanding $20 million in damages for an NFL career-ending infection that he plausibly claimed he had contracted in a Buccaneers locker room. *See, e.g.*, Dkt. 229-19 at 1. This demand well exceeded the $1 million limits of the Buccaneers' primary EL policy. *See, e.g.*, Dkt. 229-20 at 3 n.1. It is undisputed that the Buccaneers asked American Specialty to provide excess EL coverage, over and above the $1 million underlying limit. *See, e.g.* Dkt. 263-9 at 1-3, 40. It was therefore no surprise that, when the Tynes case went to mediation, the Buccaneers were

threatening to file suit against AXIS, as the putative excess carrier, seeking reformation of the excess policy to provide the coverage the Buccaneers had requested. *See, e.g.*, Dkt. 229-21 at 7-12; Dkt. 139, ¶¶ 118-19. And had suit been filed, the Buccaneers would have discovered the correspondence in which American Specialty asserted, and then reiterated, that it had mistakenly issued the excess policy without excess EL coverage. *See* Dkt. 229-14 at 1; Dkt. 229-17 at 1-2. This would have given the Buccaneers all they needed to argue there had been a mutual mistake and thus that reformation of the excess policy was appropriate. *See, e.g.*, Dkt. 235-7, 31:14-33:13, 184:18-185:23; Dkt. 263-14, 57:7-59:14.

Given these circumstances, AXIS's decision to contribute a fraction of its potential exposure toward settlement, so as to avoid the prospect of expensive litigation the possibility of liability, was more than fair and reasonable.

## IV.  The District Court's "Tender-Or-Actual-Liability" Rule Conflicts With Indiana Law.

The District Court's adoption of a "tender-or-actual-liability" requirement cannot be reconciled with Indiana law.

### A.    The District Court's Application of a "Tender-or-Actual-Liability" Standard Negates Indiana Law's Estoppel Analysis.

For one, contrary to what the District Court stated in its summary judgment ruling,[12] whether the indemnitor had notice of and the opportunity to control settlement discussions (which would go along with a tender of defense) has nothing to do with whether the settlement itself was "voluntary," or whether the indemnitee can enforce its contractual indemnification rights. Notice and an opportunity to participate in the settlement are considered **only** for purposes of evaluating whether the indemnitor is estopped from challenging the fairness and reasonableness of the settlement terms. *See, e.g.*, *Sequa Coatings*, 797 N.E.2d at 1230. Under Indiana law, if an indemnitee can show that it provided the indemnitor with the required notice and opportunity, the indemnitee need not demonstrate that the settlement was fair and reasonable; fairness and reasonableness effectively are presumed. *See, e.g.*, *id.* Thus, absent the parties' indemnification agreement requiring the indemnitee to

---

[12] *See* SA 1 ("This case presents the question whether AXIS paid a loss for which it was not liable or in a manner that rendered its settlement contribution voluntary such as to foreclose a request for indemnity."); *id.* at 8 ("[T]oday's case concerns the right to notice and to an opportunity to defend before a party settles a claim voluntarily. Absent this manner of tender, or alternatively given an active refusal to accept a defense, an indemnitee proceeds at its own risk in settling a dispute.").

tender a defense or show actual liability, Indiana courts do not impose a "tender-or-actual-liability" requirement.

If, as the District Court concluded, an indemnitee's failure to tender a defense or show actual liability necessarily rendered its settlement payment "voluntary," and thus its claim for indemnification unenforceable, Indiana courts would never have any need to determine whether the indemnitor is estopped from challenging the settlement amount. The threshold question in these sorts of cases would always be whether the indemnitee tendered a defense. If not, that would be the end of the matter; there could be no viable indemnification claim. If so—if the indemnitee did tender a defense—there would be no need for the courts to determine at step two whether the indemnitor had notice and an opportunity to participate in the settlement; the courts already would have answered that question at step one; for tendering a defense necessarily would entail tendering the opportunity to control, and thus participate in and approve, any settlement.

To put this all a little differently, think of the problem created by the District Court's decision this way: the "tender-or-actual-liability" rule collapses    the    second    and    third    requirements    for    obtaining

56

indemnification under Indiana law, and ignores the potential liability standard that is already part and parcel of the voluntariness prong. If tender of a defense is always a precondition to an indemnification claim, then a court will ***never*** have any occasion to address whether the settlement was fair and reasonable because the practical reality is that the indemnitor always is going to be estopped from challenging the settlement under cases like *Sequa Coatings*. Presumably there will be no indemnification suit filed if the indemnitee tenders the defense and the indemnitor agrees to accept the defense; there will be an indemnification claim filed only if the indemnitee tenders the defense, and the indemnitor refuses to defend. And in that circumstance—when a defense is tendered—under *Sequa Coatings*, the indemnitor will always be estopped from challenging the fairness and reasonableness of the settlement.

That cannot be right, and it is not how Indiana cases play out. In *Progressive* and *Sink & Edwards*, for example, each court remanded for a finding on the fairness and reasonableness of the settlement amount after determining whether the settlement itself was voluntary. *See Progressive*, 533 N.E.2d at 1287; *Sink & Edwards*, 458 N.E.2d at 297. Put otherwise, both of these courts determined the indemnitee had not

"voluntarily" settled the underlying claim without conditioning that de-
termination on whether the notice given included a tender of defense or
offer to approve any settlement. Only after confirming the lack of volun-
tariness of each settlement in light of the objective risk of potential lia-
bility each indemnitee faced did the courts remand the cases to the re-
spective trial courts for consideration of whether the indemnitee had pro-
vided the indemnitor with sufficient opportunity to participate in the set-
tlement so as to preclude a challenge to the fairness and reasonableness
of its terms. Were Indiana law to require courts to consider the sufficiency
of an indemnitee's notice to an indemnitor to establish, in the first in-
stance, that the indemnitee did not voluntarily settle, these Indiana de-
cisions—which *require* the trial courts to consider the sufficiency of the
indemnitee's notice only after finding a lack of voluntariness—would
make no sense.

> **B.     Indiana Law Provides Ample Opportunity for Indem-
> nitors to Protect Their Interests Without Imposing a
> "Tender-or-Actual-Liability" Requirement.**

The District Court was understandably concerned with the fairness
of requiring American Specialty to indemnify AXIS for a settlement pay-
ment American Specialty had not specifically approved. It wanted to

ensure that American Specialty had received what it referred to as a certain measure of "due process."  SA 8. But Indiana's framework for evaluating demands for indemnification of settled claims—even without imposing a "tender-or-actual-liability" requirement—accounts for the same concern, just not in the way the District Court believed. Indiana law provides a contractual indemnitor with no less than three opportunities, as the District Court put it, "to protect its interests . . . before liability attaches or a settlement has been reached" (*id.*):

1. by explicitly contracting for protections against unfair claims of indemnification by providing that the indemnitee must satisfy certain preconditions, such as tendering the defense and obtaining the indemnitor's approval of any settlement;

2. by forcing the indemnitee to demonstrate that it, objectively, bore potential liability to the party with whom it settled; and

3. by insisting, if it had no notice or opportunity to participate in the settlement, that the indemnitee demonstrate the fairness and reasonableness of the terms to which it agreed.

These track the requirements of Indiana law discussed earlier.

Indiana law is not unique in this regard. As noted previously, other jurisdictions have declined to require an indemnitee to tender a defense absent language in the parties' agreement requiring such tender. *See*

*supra* at 39-40 (citing, e.g., *Smith*, 2017 WL 3051524 at *5 & n.9, *Fontenot*, 791 F.2d at 1221, and *Premier*, 578 F.2d at 554); *see also Kaydon Acquisition Corp. v. Custum Mfg., Inc.*, 317 F. Supp. 2d 896, 908 (N.D. Iowa 2004) (explicitly recognizing that Indiana law differs from the "controlling . . . authority" in some other jurisdictions in that it does not require proof of actual liability).

In fact, even some of the out-of-state cases the District Court relied on do not rigidly impose a "tender-or-actual-liability" rule in the manner the District Court did here. In *One Beacon Insurance, LLC v. M & M Pizza, Inc.*, 8 A.3d 18, 24 (N.H. 2010), for example, the court held that the indemnitee sufficiently preserved its indemnification rights by sending a letter advising the indemnitor of a pending mediation; asking the indemnitor to "attend with authority to contribute money toward the settlement"; and threatening to sue to enforce the parties' indemnification agreement if the indemnitor did not participate. That is what happened here. And in *Jennings v. United States*, 374 F.2d 983, 985-86 (4th Cir. 1967), the dispute was not over whether there had been a tender of the defense, but whether the indemnitor even **knew** about the underlying claim, such that it would have had the opportunity "to participate" in any

60

settlement. Along these lines, the court in *Valloric v. Dravo Corp.*, 357 S.E.2d 207, 213 (W. Va. 1987), recognized that many of the cases that "hold an indemnitee to an actual liability standard involve a fact pattern where the indemnitor has not been notified of the underlying litigation and given an opportunity to participate in the settlement negotiations."

Still other out-of-state authorities relied on by the District Court are distinguishable on their facts. Several explicitly state that the "tender-or-actual-liability" paradigm does not apply to indemnification claims based on written contracts and did ***not*** involve contractual indemnification claims. *See Chevron Oronite v. Jacobs Field Servs. N. Am., Inc.*, 951 F.3d 219, 226 (5th Cir. 2020) (holding that indemnification "claim . . . predicated on written contracts . . . fits squarely within an exception to the 'actual liability' rule"); *Atlantic Richfield Co. v. Interstate Oil Transp. Co.*, 784 F.2d 106, 111 (2d Cir. 1986) (addressing dispute under maritime law and distinguishing "cases in which the indemnification claim was founded upon . . . a written contract"); *Jennings*, 374 F.2d at 984-85 (concerning subrogation claim under the Federal Tort Claims Act); *Pan Am. Petroleum Corp. v. Maddux Well Serv.*, 586 P.2d 1220, 1221-22 (Wyo. 1978) (evaluating implied indemnification claims). This distinction

61

accords with Indiana courts' differential treatment of common-law and contractual indemnity claims. *See, e.g.*, *Indianapolis-Marion Cnty. Pub. Libr.*, 929 N.E.2d at 848 (distinguishing between common-law and contractual indemnity claims and declining "to adopt the doctrine of implied contractual indemnity" under Indiana law); *McClish v. Niagara Mach. & Tool Works*, 266 F. Supp. 987, 988 (S.D. Ind. 1967) (summarizing Indiana law on implied indemnity claims as distinguished from contractual indemnity claims).

So rather than establishing that Indiana law requires an indemnitor to tender a defense or prove actual liability, despite no Indiana authority saying so, these out-of-state authorities, as well as the others the District Court cited, highlight that each jurisdiction has developed its own test for evaluating demands for contractual indemnification of settled claims, to ensure their fairness while promoting settlement and protecting parties' freedom to contract. There are, of course, some similarities across certain jurisdictions, but there are also differences. Indiana law in this regard stands on equal footing with all of these other jurisdictions and must be enforced according to its own terms.

* * * * *

62

AXIS did everything it was required to do under Indiana law to seek and obtain indemnification from American Specialty. It complied with the PMA, and American Specialty has not argued otherwise. Its settlement payment was not "voluntary." And it gave American Specialty notice of and an opportunity to participate in settlement discussions; and, even if it had not, AXIS contributed to the Tynes settlement on terms that were, in fact, fair and reasonable. That is enough to trigger American Specialty's indemnification obligations; AXIS did not need to tender a defense or prove actual liability.

## CONCLUSION

For all of the forgoing reasons, the District Court's grant of summary judgment in American Specialty's favor should be reversed. In addition, because the reasons that support the denial of American Specialty's summary judgment motion are coextensive with the denial of AXIS's request for summary judgment on American Specialty's Affirmative Defense Nos. 4 and 16, that part of the District Court's judgment should be reversed as well.

Date:   July 14, 2023

FAEGRE DRINKER BIDDLE & REATH LLP

*/s/ Brian J. Paul*
Brian J. Paul
Ryan M. Hurley
Stephanie L. Gutwein
Emily A. Kile-Maxwell
300 North Meridian Street, Ste. 2500
Indianapolis, IN 46204
Telephone:  317-237-0300
Fax:  317-237-1000
brian.paul@faegredrinker.com
ryan.hurley@faegredrinker.com
stephanie.gutwein@faegredrinker.com
emily.kilemaxwell@faegredrinker.com

*Attorneys for Plaintiff-Appellant*
*AXIS Insurance Company*

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.     This document complies with the word limit of Fed. R. App. P. 32(a)(7)(b)(i) and Circuit Rule 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,378 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32(b) because this document has been prepared using Microsoft Word for Office 365 in a proportionally spaced typeface using Century Schoolbook size 14 font.

Date:   July 14, 2023

*/s/ Brian J. Paul*_____

*Attorney for Plaintiff-Appellant*
*AXIS Insurance Company*

# CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2023, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

> Lawrence P. Ingram
> Christina L. Flatau
> Hoyt L. Prindle III
> Porter Wright Morris & Arthur LLP
> 201 N. Franklin Street, Ste. 1600
> Tampa, FL 33602
>
> William P. Kealey
> Stuart & Branigin LLP
> 300 Main Street, Ste. 900
> PO Box 1010
> West Lafayette, IN 47902
>
>
> */s/ Brian J. Paul*

No. 23-1698

# In the
# United States Court of Appeals
## for the Seventh Circuit

———————————

AXIS INSURANCE COMPANY,
*Plaintiff-Appellant*

*v.*

AMERICAN SPECIALTY INSURANCE & RISK SERVICES, INC.,
*Defendant-Appellee*

———————————

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division
No. 1:19-cv-00165-DRL-SLC
The Honorable Damon R. Leichty, Judge

———————————

**REQUIRED SHORT APPENDIX FOR PLAINTIFF-APPELLANT**

———————————

Brian J. Paul
Ryan M. Hurley
Stephanie L. Gutwein
Emily A. Kile-Maxwell
300 North Meridian Street, Ste. 2500
Indianapolis, IN 46204
Telephone: 317-237-0300
Fax: 317-237-1000
brian.paul@faegredrinker.com
ryan.hurley@faegredrinker.com
stephanie.gutwein@faegredrinker.com
emily.kilemaxwell@faegredrinker.com
*Attorneys for Plaintiff-Appellant*
*AXIS Insurance Company*

# Table of Contents

**Page**

Opinion and Order (Dkt. 297)……………………………..………………………1

Judgment in a Civil Action (Dkt. 299)…………….………………………16

Certificate of Compliance with Circuit Rule 30(d)……………………17

Certificate of Service…………………………………………………………18

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

AXIS INSURANCE COMPANY,

Plaintiff,

v.

CAUSE NO. 1:19-CV-165 DRL

AMERICAN SPECIALTY INSURANCE &
RISK SERVICES, INC.,

Defendant.

OPINION AND ORDER

In 2015, Tampa Bay Buccaneers kicker Lawrence Tynes sued the franchise for an off-the-field injury that ended his decorated career. The Buccaneers believed the franchise had insurance coverage based on representations in a proposal from one broker, American Specialty Insurance & Risk Services, Inc. American Specialty served as underwriter for AXIS Insurance Company. But AXIS called an audible and denied coverage. The Tynes suit never progressed to name American Specialty or AXIS.

Instead, as the suit proceeded against the Buccaneers, rather than ask American Specialty to defend even a potential claim, AXIS directed American Specialty to stay out of it, and did so for eighteen months. AXIS maintained its position that it wasn't actually liable because the insurance policy provided no coverage. At mediation, AXIS nevertheless chose to attend and contribute to a Buccaneers settlement in exchange for the franchise's promise not to sue AXIS. AXIS had invited American Specialty to consider a "market solution" at mediation too but never asked for a defense.

American Specialty's silence and lack of contribution at mediation kicked off AXIS's suit based on an indemnity clause in their Program Manager Agreement. This case presents the question whether AXIS paid a loss for which it was not liable or in a manner that rendered its settlement contribution voluntary such as to foreclose a request for indemnity. American Specialty requests summary judgment for this reason. The court grants summary judgment accordingly.

BACKGROUND

On February 1, 2008, American Specialty and AXIS entered into a Program Manager Agreement (PMA) [ECF 235-1]. This contract governed American Specialty's duties to AXIS, authorizing American Specialty to accept proposals for insurance, negotiate, underwrite, and accept insurance coverages on AXIS's behalf. The PMA included an indemnity provision that required American Specialty to indemnify AXIS for losses stemming from American Specialty's errors or omissions in the performance or breach of duties under the PMA [*id.* § 27.4].

An agent (from Marsh USA) for the Buccaneers contacted American Specialty on May 9, 2013. Seeking an insurance quote, the agent informed American Specialty that one of the items the team sought in its new policy was excess liability coverage. American Specialty knew to view insurance policy proposals for NFL teams as an AXIS referral. The parties debate whether American Specialty's referral ever contemplated excess liability coverage and whether AXIS ever approved such coverage, though the referral never seems to identify its need explicitly.

American Specialty provided an insurance proposal and binder to the Buccaneers on May 28 and June 4, 2013 respectively [ECF 235-3, 235-4]. The proposal and binder listed primary employer's liability coverage as "TBD." The documents never seemed to mention excess employer's liability coverage. The proposal explained that its terms did "not represent contract terms" but the policy would be subject to (though not limited to) "all terms, conditions, and exclusions as noted." By its terms, the binder constituted "temporary evidence of insurance coverage and will be replaced by [a] policy."

On June 6, 2013, American Specialty delivered the AXIS Excess Policy to the Buccaneers [ECF 235-5]. The policy omitted a schedule of primary employer's liability insurance policy, much less contained any excess coverage. In May 2014, the Buccaneers (through its agent) notified American Specialty that excess employer's liability coverage was absent from the policy and requested that it be added, but American Specialty did not notify AXIS at that time.

SA 002

In July 2013, kicker Lawrence Tynes joined the Buccaneers. He developed a MRSA infection that he claimed originated from the team's facility. On March 2, 2015, Mr. Tynes sent the Buccaneers a draft complaint seeking damages from this injury. On March 5, American Specialty notified AXIS of this claim. On March 24, AXIS denied coverage for the Tynes claim, telling the Buccaneers that AXIS would neither defend nor indemnify the team.

On April 29, 2015, AXIS informed American Specialty that it "had no authority" over the Tynes claim and "should not be involved in the claims handling in any way," including "any discussions, selection of counsel or agreement on cost share" [ECF 235-17]. AXIS reiterated its stance on May 4, 2015, stating that "American Specialty is not to have any role in the directing or managing of the defense of this claim" [ECF 235-13].

Instead, AXIS instructed that "American Specialty's primary obligation is to maintain an administrative file, process expenses, chronicle the file with claim note entries, report as requested, review the reporting completed by defense counsel, and report to AXIS accordingly" [*id.*]. Despite AXIS's directives, AXIS still expected American Specialty to indemnify AXIS "for any consequential damages suffered by AXIS as a result of the underwriting of the AXIS Excess Policy" [*id.*]. American Specialty responded on May 14, claiming that AXIS had approved the excess employer's liability coverage and that the policy should be reformed due to a clerical error [ECF 229-17].

Mr. Tynes sued the Buccaneers in May 2015 in Florida state court. On October 5, 2016, the Buccaneers notified AXIS and American Specialty of an upcoming mediation with Mr. Tynes and "expected" their representatives to attend. AXIS told the Buccaneers that "based on the disclaimer language in both the proposal and the binder, as well as the ultimate lack of excess employer's liability coverage in the policy, there is insufficient evidence to merit reformation of the excess policy, and AXIS hereby declines to do so" [ECF 235-20].

AXIS nonetheless decided to attend the mediation. On November 7, 2016, AXIS reached out to American Specialty about the mediation [ECF 235-14]. AXIS stood by its expectation that American Specialty would "honor fully its commitment to defend and indemnify AXIS from any loss that may result," though seemingly only should a court or jury rule against the insurer [*id.* 3]. AXIS also invited American Specialty to attend the mediation because it may be in American Specialty's interest "to try to accomplish a market solution to resolve this claim" [*id.*]. American Specialty never responded.

AXIS attended the mediation without American Specialty and contributed to a settlement with Mr. Tynes—a self-described "commercial accommodation" and not an admission of liability. In exchange, the Buccaneers agreed not to sue AXIS for any coverage issues underlying the Tynes claim. AXIS then sued American Specialty, seeking indemnification for AXIS's contribution to the settlement.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary

SA 004

judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

A.    *American Specialty's Summary Judgment Motion.*

The court (sitting in diversity) applies Indiana's choice of law rules. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938); *Ruiz v. Blentech Corp.,* 89 F.3d 320, 323 (7th Cir. 1996). The PMA says Indiana law governs the contract, and both parties agree, so the court will interpret the PMA through its selected lens of Indiana law. *See Great West Cas. Co. v. Robbins*, 833 F.3d 711, 715 (7th Cir. 2016); *see also McCoy v. Iberdrola Renewables, Inc.,* 760 F.3d 674, 684 (7th Cir. 2014); *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004).

Contract principles govern this indemnity question, so the court starts there. A contract's interpretation is generally a question of law, *Song v. Iatarola*, 76 N.E.3d 926, 933 (Ind. Ct. App. 2017), controlled by the parties' intent as expressed by clear contractual language, *City of Jeffersonville v. Env't Mgmt. Corp.*, 954 N.E.2d 1000, 1008 (Ind. Ct. App. 2011). "[W]hen the terms of a contract are drafted in clear and unambiguous language, [the court] will apply the plain and ordinary meaning of that language and enforce the contract according to [its] terms." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). No one argues that the indemnity provision is ambiguous.

Under the PMA, American Specialty agreed "to defend, indemnify, and hold AXIS harmless from and against all claims, actions, causes of action, liability or loss which result from any negligent or willful acts, errors or omissions of [American Specialty], or its servants and employees in the performance or breach of duties under this Agreement" [ECF 235-1 § 27.4]. After identifying other forms of breach that would trigger indemnification, the PMA defined loss as "all damages, costs, expenses, reasonable attorneys' fees and other legal fees, penalties, fines, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible by law) and any other expense or expenditure incurred by AXIS" [*id.*]. AXIS had a duty to notify American Specialty "[u]pon the assertion by any third

SA 005

party of any claim that may give rise to liability for which the [American Specialty] may have an obligation to indemnify [AXIS]" [*id.* § 27.6].

American Specialty argues that (regardless of whether it breached the PMA) the indemnity clause doesn't apply because AXIS voluntarily contributed to the Tynes settlement. That is, American Specialty contends that AXIS was under no legal obligation to contribute to the settlement because no claim was pending against AXIS and the insurer had no liability. American Specialty also asserts that AXIS needed to give American Specialty an opportunity to defend before settling.

AXIS counters that American Specialty denied liability on the contract, allowing AXIS to settle without consulting American Specialty. AXIS concedes that the Buccaneers never asserted a formal claim against AXIS, so AXIS never was in a position to tender a formal claim to American Specialty. AXIS nevertheless points to the player's claim against the Buccaneers, arguing that the PMA requires indemnity for "*all* claims, liabilities, and losses resulting from [American Specialty's] negligent or willful acts, errors, or omissions." AXIS says American Specialty's actions created a risk of a claim or liability to the Buccaneers, so AXIS contributed to the settlement to eliminate this risk.[1] AXIS also argues that it was not required to give American Specialty an opportunity to defend before settling.

Although Indiana law generally enforces indemnity clauses within the guise of the freedom to contract, "indemnity does not cover losses for which the indemnitee is not liable, but which he voluntarily pays." *Progressive Constr. & Eng'g Co. v. Ind. & Mich. Elec. Co.*, 533 N.E.2d 1279, 1287 (Ind. Ct. App. 1989); *Sink & Edwards, Inc. v. Huber, Hunt, & Nichols, Inc.*, 458 N.E.2d 291, 297 (Ind. Ct. App. 1984). Merely that

---

[1] The parties at times question whether there was a "claim," though the parties seem to recognize that an anticipated "claim" existed, and certainly that potential "liability" existed—both of which the indemnity provision would plainly cover. *See also Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, PC*, 929 N.E.2d 838, 849 n.9 (Ind. Ct. App. 2010) (if the agreement protects against "liability," indemnity perfects when that liability has become fixed, including when indemnitee "tenders payment in settlement of the underlying claim"). Section 27.6 of the PMA required notice of any claim that "may" give rise to liability.

an indemnitee (AXIS) has decided not to face a judgment isn't alone a basis for saying the settlement was a voluntary payment.[2]

"An indemnitor who denies liability on an indemnity contract confers on the indemnitee the right to exercise reasonable judgment in settling the case without further consultation with the indemnitor." *Sequa Coatings Corp. v. N. Ind. Commuter Transp. Dist.*, 796 N.E.2d 1216, 1230 (Ind. Ct. App. 2003) (citation omitted). This is so "when the indemnitor has had an opportunity to participate in the claim but fails to honor the indemnity contract." *Bethlehem Steel Corp. v. Sercon Corp.*, 654 N.E.2d 1163, 1168 (Ind. Ct. App. 1995). An indemnitor acquiesces to a "settlement agreement by ignoring [the indemnitee's] requests for indemnification and assistance in defending against the litigation." *Sequa Coatings*, 796 N.E.2d at 1230.

That an indemnitor has denied liability on an indemnity contract for purposes of a settlement presupposes that it has received notice and an opportunity to defend against the claim. *See id.*; *Price v. Amoco Oil Co.*, 524 F. Supp. 364, 367 (S.D. Ind. 1981). A settlement is "not effected without notice [to the indemnitor] and an opportunity to assume the defense of the action." *Price*, 524 F. Supp. at 367.

> If the indemnitee, having notified the indemnitor, refuses to accept proffered assistance, or fails to tender the defense of the action, the indemnitee proceeds at his or her own risk with regard to any judgment or settlement [that] may ultimately ensue, and the indemnitee must establish that the indemnitor would have been liable or prove actual liability.

42 C.J.S. *Indemnity* § 29 (2022). This treatise, often cited by Indiana courts addressing indemnity issues, *see, e.g.*, *Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, PC*, 929 N.E.2d 838, 849 n.9 (Ind. Ct. App. 2010); *Henthorne v. Legacy Healthcare, Inc.*, 764 N.E.2d 751, 758 (Ind. Ct. App. 2002), underscores the risk that an indemnitee like AXIS takes by not just demanding indemnity through its notice, but affording an opportunity to defend, including consideration of any settlement.

---

[2] In the context of a settlement, "a question as to whether the settlement was fair and reasonable remains." *Progressive*, 533 N.E.2d at 1287. This isn't the question today. Similarly not the question today is any principle of subrogation as AXIS confirms it is not proceeding in that manner, only under the PMA. *See, e.g., Ohio Casualty Group of Ins. Cos. v. Royal-Globe Ins. Cos.*, 413 N.E.2d 678, 679-80 (Ind. Ct. App. 1980) (discussing subrogation rights after a refusal to defend).

SA 007

The law views this condition as an outgrowth of some measure of due process. In the context of settlements, notice and an opportunity to defend affords the indemnitor (American Specialty) the chance to protect its interests and those of its indemnitee (AXIS) before liability attaches or a settlement has been reached. It ensures that the indemnitor does not use the indemnity contract in bad faith to shift its own liability onto the indemnitor without the indemnitor engaging in a full-throated defense. This same notice permits the indemnitee to exercise its right to impose the burden of a defense on the party who ultimately must pay the settlement that might come, and to contest the facts on which that settlement might depend. *See* 42 C.J.S. *Indemnity* § 29 (2022). It would be fundamentally inequitable to stick the indemnitor with liability when the indemnitee has never given, much worse actively subverted, the opportunity to defend liability in the first place, particularly when that liability seemingly arises only because of the indemnitor's very conduct. If so, then let it defend its actions.

In each case offered by the parties where an indemnity right for a settlement payment was preserved, the indemnitee had not just requested indemnity but given the indemnitor the opportunity to defend. *See Sequa*, 796 N.E.2d at 1230 (indemnitor ignored "repeated requests for indemnification and assistance in defending against the litigation"); *Sink*, 458 N.E.2d at 293 (indemnitor received notice of "intention to settle and given the opportunity to take over the defense of the action"); *Price*, 524 F. Supp. at 366 (settlement effectuated only after notice "and an opportunity to assume the defense of the action"). The duties to defend and indemnify remain independent, and the first proves broader, *see Henthorne*, 764 N.E.2d at 757, but today's case concerns the right to notice and to an opportunity to defend before a party settles a claim voluntarily. Absent this manner of tender, or alternatively given an active refusal to accept a defense, an indemnitee proceeds at its own risk in settling a dispute.

Thus Indiana has adopted the rule that an indemnitor acquiesces to a "settlement agreement by ignoring [the indemnitee's] requests for indemnification and assistance in defending against the litigation" such that in its denial of liability on the contact the indemnitor "confers on the indemnitee the right to

8

exercise reasonable judgment in settling the case without further consultation with the indemnitor." *Sequa Coatings*, 796 N.E.2d at 1230; *accord Motorists Mut. Ins. Co. v. Johnson*, 218 N.E.2d 712, 717 (Ind. Ct. App. 1966) (indemnitor bound "provided it had notice of such litigation and an opportunity to control its proceedings"). Indeed, through the tender and then refusal to defend, an indemnitor would proceed at its peril and could be collaterally estopped from challenging whether it had any duty to indemnify should the indemnitee settle the claim. *See Roadsafe Holdings, Inc. v. Walsh Constr. Co.*, 164 N.E.3d 726, 732-33 (Ind. Ct. App. 2021). At the same time, the indemnitee would proceed at its peril in paying losses for which it was not liable. *See Progressive*, 533 N.E.2d at 1287.

So these scenarios present risk to both indemnitor and indemnitee—to the indemnitee if it never tenders its defense and then voluntarily settles a claim, or to the indemnitor if it denies the indemnitee's tender of the defense and the indemnitee then settles the claim (absent a declaratory judgment action or offering a defense under some reservation of rights). If any question might linger on this read of Indiana law, it stands in line with the great weight of authority. This rule of law isn't novel.

Courts traditionally have required a tender of defense; and when that tender has not been made, or when the party has not been informed of the settlement until afterwards or not participated in the negotiations and approved the agreement, the right to indemnity has been lost, absent a showing of actual liability. *See Atl. Richfield Co. v. Interstate Oil Transp. Co.*, 784 F.2d 106, 112 (2d Cir. 1986); *see, e.g.*, *Chevron Oronite Co., L.L.C. v. Jacobs Field Servs. N. Am., Inc.*, 951 F.3d 219, 226 (5th Cir. 2020) (the indemnitee "can avoid having to prove actual liability by giving the indemnitor, before a settlement is finalized, the choice" of approving the settlement or taking over the defense); *Seguros del Estado, S.A. v. Sci. Games, Inc.*, 262 F.3d 1164, 1178 (11th Cir. 2001) ("an indemnitee, after giving the indemnitor notice and an opportunity to defend, could settle a lawsuit and claim indemnity upon a showing that the decision to settle was reasonable") (citation omitted); *Jennings v. United States*, 374 F.2d 983, 986 (4th Cir. 1967) ("indemnitee's unilateral acts, albeit reasonable and undertaken in good faith, cannot bind the indemnitor; notice and an

SA 009

opportunity to defend are the indispensable due process satisfying elements"); *Genger v. Genger*, 76 F. Supp.3d 488, 501 (S.D.N.Y. 2015) ("indemnitee cannot seek reimbursement from an indemnitor unless the indemnitee first notifies the indemnitor of a potentially covered claim and gives them an opportunity to defend against it"); *see also One Beacon Ins. v. M&M Pizza*, 8 A.3d 18, 23 (N.H. 2010); *Stamp Tech, Inc. (By & Through Blair) v. Lydall/Thermal Acoustical, Inc.*, 987 A.2d 292, 298 (Vt. 2009); *Star Elec. Contrs., Inc. v. Stone Bldg. Co.*, 863 So. 2d 1071, 1075 (Ala. 2003); *Pan Am. Petroleum Corp. v. Maddux Well Serv.*, 586 P.2d 1220, 1225 (Wyo. 1978); *Valloric v. Dravo Corp.*, 357 S.E.2d 207, 211 (W. Va. Ct. App. 1987); *cf. Hofheins v. Bajio Mountain W. LLC*, 414 P.3d 531, 540 (Utah Ct. App. 2017) (rejecting argument that "the indemnitee's failure to tender a defense would release the indemnitor from its indemnification obligation" but may alter burden of proof).

A contract might write a different obligation, but the court today has not been presented with argument that this one did.[3] Rather than tender the defense to American Specialty, AXIS prohibited the broker from defending the claim. On the very eve of the lawsuit by Mr. Tynes against the Buccaneers, AXIS told American Specialty that it "had no authority" over the Tynes claim and "should not be involved in the claims handling in any way," including "any discussions, selection of counsel or agreement on cost share." Five days later, AXIS emphasized that "American Specialty has no authority with respect to handling this claim." More to the point, rather than afford American Specialty an opportunity to defend, AXIS foreclosed American Specialty from defending. "American Specialty is not to have any role in the directing or managing of the defense of this claim," AXIS insisted.

---

[3] To the contrary, the PMA required notice. AXIS had a duty to notify American Specialty "[u]pon the assertion by any third party of any claim that may give rise to liability for which the [American Specialty] may have an obligation to indemnify [AXIS]" [ECF 235-1 § 27.6]. AXIS never argues that the remainder of this provision governing indemnification procedures alters this analysis under Indiana law. It never argues that this provision required something less than the tender of defense. It alludes generally to prejudice once or twice in briefing, but never in reference to the PMA or this provision. The court won't develop arguments for the parties. *See Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010).

SA 010

AXIS said it reserved its rights to defense and indemnity, but never thereafter afforded the defense to American Specialty. Instead, for eighteen months—the entire pendency of the Tynes lawsuit until a settlement—AXIS maintained its position that "American Specialty is not to have any role in the directing or managing of the defense of this claim." Rather than accept a defense, AXIS foreclosed American Specialty's ability to defend. Moreover, AXIS continued to maintain a firm line that it had no liability whatsoever on the policy.

The only question is whether, at some point before or on the eve of mediation, AXIS pivoted. On this record, the answer is indisputably no. AXIS candidly acknowledges that it never communicated a change to that directive. It might prove difficult to alter course from an eighteen-month-long clear directive, and the pre-mediation letter let that directive stand. Once more AXIS reserved its rights, as it said it did before, but it never tendered the defense to American Specialty, never asked American Specialty to attend the mediation to defend AXIS, and never gave American Specialty the opportunity to defend or approve the settlement.

Indeed, even in the reservation of its rights this time, AXIS did so only should "a court or jury" reach a conclusion about liability, not if AXIS settled. After all, AXIS underscored it had no coverage obligation under the policy as issued. To be sure, the letter invited American Specialty to the mediation, but only because it "may be in the mutual interest of American Specialty and Marsh USA" (the other broker) to participate in a "market solution to resolve this claim." This letter was about having pocketbooks at the table, not ensuring that American Specialty attended to defend AXIS or to defend the claim. No reasonable jury could see it otherwise.

Nor thereafter did American Specialty deny liability on the indemnity contract—hard to do when the company has been expressly told it cannot defend the claim and when AXIS concedes that it subverted American Specialty's ability to do so. *See Sequa Coatings*, 796 N.E.2d at 1230. Again, in oral argument, AXIS concedes that at no time did American Specialty reject the indemnity obligation. *See id.*

SA 011

(only an "indemnitor who denies liability on an indemnity contract confers on the indemnitee the right to exercise reasonable judgment in settling the case"). A communication from American Specialty (May 14, 2015) that responded to the "stay out of it" letter from AXIS never denied liability but instead asked AXIS to reform the policy. American Specialty's letters to Marsh USA likewise contain no denial of liability on the indemnity contract to AXIS, but instead asserted its position as between the brokers.

In short, AXIS identifies no evidence in which it gave American Specialty the opportunity to defend (or asked American Specialty to approve a settlement before it concluded), or in which American Specialty thereafter denied its liability under the indemnity contract. *See id.*; *Sink*, 458 N.E.2d at 293. Both factual gaps mean that AXIS proceeded at its own risk to settle voluntarily. To that point, AXIS's representative testified that its participation in the "market solution" of mediation was "voluntary" because it was the "prudent course to take."

That leaves one question—whether AXIS has shown its actual liability to the Buccaneers (or to Mr. Tynes). AXIS offers no evidence on this record that it would have been actually liable; to the contrary, the company maintains its position that its insurance policy foreclosed coverage, and it only alludes to potential liability because of anything that American Specialty did by way of breaching the PMA. Throughout briefing, AXIS frames its liability as "potential." Given what the policy said about coverage, AXIS cannot claim that its liability was "actual." *See Citizens Prop. Ins. Corp. v. Manor House, LLC*, 313 So.3d 579, 583 (Fla. 2021) ("parties must rely on what they actually have pursuant to the express terms and conditions of the insurance policy").[4] Everyone seems to understand that the policy never scheduled employer's liability coverage, a position that AXIS could have argued in defense against the Buccaneers, or frankly one American Specialty could have argued if given the chance at a defense. It was not inevitable that AXIS would actually lose. *See Progressive*, 533 N.E.2d at 1287 ("indemnity does not cover losses for which the indemnitee is not liable").

---

[4] Florida law governed the Buccaneers' insurance policy with AXIS [ECF 235-14 at 2].

SA 012

The court has considered whether AXIS intended to pursue another contract action here—outside the indemnity provision—but the insurer assures the court that its claim remains solely one of indemnification, using the contract breaches only as a mechanism to trigger the indemnity clause as written. Without evidence that AXIS conferred an opportunity to defend to American Specialty, and indeed counter evidence that AXIS explicitly told American Specialty to stay out of the defense, and without evidence that American Specialty denied liability on the indemnity contract before AXIS voluntarily settled with the Buccaneers, no reasonable jury could find for AXIS on its indemnification claim. The court thus grants summary judgment for American Specialty.

B.    *Motions to Seal.*

AXIS and American Specialty filed motions to seal certain documents in this litigation. Based on the discussion at oral argument, these parties defer largely to the Buccaneers on what should still be preserved confidentially. The Buccaneers filed its own motions.

"Because there is a strong presumption toward public disclosure of court files and documents, courts resolving such motions have placed the burden on the party seeking confidentiality to show good cause for keeping the documents from public view." *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 881 F.3d 550, 566 (7th Cir. 2018). "[D]ispositive documents in any litigation enter the public record notwithstanding any earlier agreement." *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 547 (7th Cir. 2002). This is "why very few categories of documents are kept confidential once their bearing on the merits of a suit has been revealed." *Id.*

The Buccaneers requested that three documents be sealed. First, the Buccaneers and American Specialty request that the confidential settlement agreement between AXIS and the Buccaneers [ECF 239] remain sealed. The parties intended that agreement to remain confidential and the court had no need to rely on the agreement in its ruling, so the court grants this request. The Buccaneers and AXIS also request that the unredacted expert report [ECF 278] and deposition [ECF 279] of American Specialty's

proposed expert (John Pappas) remain sealed. AXIS filed redacted versions of these documents as well, and the Buccaneers have no objection to the redacted versions remaining unsealed. The redactions appear to shield the settlement amount only, so the court grants the request to seal the unredacted filings in favor of the unsealed redacted filings.

American Specialty asks the court to seal its summary judgment brief and statement of material facts under seal because they reference settlement terms. The court denies this request because the court relied on these documents in its ruling. American Specialty asks to seal other exhibits as an accommodation to AXIS. The court grants this request only as to ECF 240 because it contains confidential settlement information and was not relied on by the court. The other exhibits under this motion either don't reference confidential information or were relied on by the court.

American Specialty asks the court to keep the redacted portions of its response to AXIS's partial motion for summary judgment under seal. This document does not need to be sealed because the confidential information has been redacted, so the court denies this request. Additionally, the court will keep the documents in ECF 276 under seal because they contain settlement amounts and were not relied on by the court.

AXIS asks the court to seal an exhibit [ECF 229-26] containing confidential settlement numbers. AXIS filed an unsealed redacted version of the exhibit. The redacted portions appear to be settlement amounts only, so the court grants the request to keep the unredacted version of the exhibit sealed. AXIS also moved to keep its response to American Specialty's statement of undisputed material facts and statement of additional material facts [ECF 265] under seal due to confidential settlement terms included therein. AXIS filed a redacted version as well, which redacts only settlement amounts and one quote from the settlement agreement. The court grants the request to seal the unredacted version and unseals the redacted version. AXIS requests to keep its reply to American Specialty's response to AXIS's statement of material facts under seal [ECF 270], having filed a redacted version as well. The redactions concern

SA 014

direct quotes from the settlement agreement, so the court grants the request to keep the unredacted version under seal. The court denies the motions in all other respects.

CONCLUSION

Accordingly, the court GRANTS American Specialty's summary judgment motion [ECF 231], DENIES AXIS's partial summary judgment motion to the extent coextensive with American Specialty's motion and DENIES AS MOOT the remainder [ECF 228]. The court DENIES AS MOOT the motions to exclude expert testimony or disqualify [ECF 275, 280, 282, 284]. The court GRANTS certain motions to seal [ECF 244, 267, 273, and 286]. The court GRANTS IN PART one of American Specialty's motions to seal [ECF 232] and DENIES the other [ECF 261]. The court DIRECTS the clerk to seal only the following documents: ECF 229-26, 239, 240, 265, 270, 276, 278, and 279; and DIRECTS the clerk to unseal the following documents: ECF 233, 234, 236, 237, 238, 241, 262, and 266. This order terminates the case.

SO ORDERED.

March 17, 2023

_s/ Damon R. Leichty_
Judge, United States District Court

# UNITED STATES DISTRICT COURT
for the
## Northern District of Indiana

AXIS INSURANCE COMPANY

              Plaintiff

           v.                            **Civil Action No.**     1:19cv165

AMERICAN SPECIALTY INSURANCE &
RISK SERVICES, INC.

              Defendant

## JUDGMENT IN A CIVIL ACTION

The court has ordered that (*check one*):

☐ the plaintiff _____ recover from the defendant _____ the amount of _____ dollars $_____, which includes prejudgment interest at the rate of _____% plus post-judgment interest at the rate of _____% along with costs.

☐ the plaintiff recover nothing, the action is dismissed on the merits, and the defendant _____ recover costs from the plaintiff _____.

**X** Other: <u>The court enters judgment in favor of defendant, American Specialty Insurance & Risk Services, Inc. and against plaintiff, Axis Insurance Company.</u>

This action was (*check one*):

☐ tried to a jury with Judge _____ presiding, and the jury has rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision was reached.

**X** <u>decided by Judge Damon R. Leichty on a motion for summary judgment.</u>

DATE: <u>March 20, 2023</u>         *Chanda J. Berta, Acting Clerk Of Court*

                              by <u>s/ D. Kirkwood</u>
                              *Signature of Clerk or Deputy Clerk*

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

This document, together with Plaintiff-Appellant's Separate

Appendix, complies with Circuit Rule 30 because, together, the

appendices contain all of the materials that Circuit Rules 30(a) and

30(b) require.


Date:   July 14, 2023                    */s/ Brian J. Paul*
                                         _____

                                         *Attorney for Plaintiff-Appellant*
                                         *AXIS Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2023, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

> Lawrence P. Ingram
> Christina L. Flatau
> Hoyt L. Prindle III
> Porter Wright Morris & Arthur LLP
> 201 N. Franklin Street, Ste. 1600
> Tampa, FL 33602
>
> William P. Kealey
> Stuart & Branigin LLP
> 300 Main Street, Ste. 900
> PO Box 1010
> West Lafayette, IN 47902
>
>
> */s/ Brian J. Paul*